**BURLINGTON NORTHERN RAILROAD COMPANY, Plaintiff,**

v.

**OFFICE OF INSPECTOR GENERAL; Railroad Retirement Board; Attorney General of the United States; and United States of America, Defendants.**

Civ. A. Nos. 4–90–676–A, 4–90–702–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

July 18, 1991.

Thomas Joseph Knapp, Lawrence Michael Stroik, Charles W. Shewmake, Burlington Northern R. Co., Fort Worth, Tex., for plaintiff.

Richard C. Stearns, Karen Stewart, Dept. of Justice, Federal Programs Branch, Civ. Div., Washington, D.C., for defendants.

R. Wayne Hughes, Jr., U.S. Atty.'s Office, N.D. Tex., Fort Worth, Tex., for U.S.

## MEMORANDUM OPINION AND ORDER

McBRYDE, District Judge.

### I.

### *Issues that are Immediately Before the Court*

William J. Doyle III, in his capacity as Inspector General of the Railroad Retirement Board ("Doyle"), has sought summary enforcement of a subpoena *duces tecum* directed to the "Keeper of Records" of "Burlington Northern Railroad Corporation" [sic]. The subpoena required the recipient to appear before Doyle at a specified time, date and place

> in connection with an audit review relating to programs and operations of the Railroad Retirement Board; to wit: To determine the accuracy of compensation and creditable service reports for coverage under the Railroad Retirement Tax Act and the Railroad Unemployment Insurance Act....

and "to bring ... and produce and provide" at the specified time, date and place a large number of documents described in the subpoena.[1] Doyle alleges that the subpoena was authorized by, and issued pursuant to the authority of, § 6 of the Inspector General Act of 1978 ("the Act").[2]

Burlington Northern Railroad Company ("Burlington") resists enforcement of the subpoena on the grounds that the Act grants only limited oversight authority to Doyle in respect to the Railroad Retirement Board ("Board") and its programs and operations, that Doyle lacks the statutory authority to conduct the audit of Burlington of which the subpoena is an integral part, and that the subpoena and audit are for an improper purpose and, therefore, should not be enforced.

By order signed April 2, 1991, the court directed Doyle to permit discovery sought by Burlington on matters thought by the court to be relevant to this action. Doyle and the United States of America sought and obtained a writ of mandamus from the Fifth Circuit directing that the court vacate the discovery order and promptly address and decide the action for enforcement of

1. Defendants' Answer to Plaintiff's Second Amended Complaint and Counterclaim, ex. A.

2. 5 U.S.C. app. 3 §§ 1–12.

the subpoena.[3] The opinion of the Fifth Circuit authorized this court to evaluate whether Burlington is to be permitted a limited, measured amount of discovery in the enforcement action.[4] On June 4, 1991, the court ordered Burlington to advise the court of any proposed discovery it wished to conduct on issues related to the enforcement feature of the litigation. Burlington submitted proposed limited discovery requests, to which Doyle has filed opposition.

The evidentiary record before the court consists of affidavits and other documents filed by Doyle, Burlington, and Association of American Railroads (which, with leave of court, filed an *amicus curiae* brief in CA4–90–702–A prior to its consolidation into CA4–90–676–A), respectively. Facts related in this memorandum opinion and order are based on this evidentiary material.

## II.

*Explanations Doyle Initially Gave for the Nature and Conduct of the Audit to Which the Subpoena is Related*

■ Doyle's first overt step in setting in motion the audit activity of which the subpoena was an integral part was a letter dated March 21, 1990, from one of his assistants to the controller of Burlington in which the nature and purpose of the audit were explained as follows:

> The purposes of this letter are to (1) inform you about the Office of Inspector General at the Railroad Retirement Board and (2) advise you of our plans to audit limited aspects of the Burlington Northern Railroad Company.
>
> . . . .
>
> Railroads contribute a significant percentage of the total revenues of the Railroad Retirement Board which are in turn used to pay various types of benefits to railroad workers and their families. It is

important that each railroad know the others are properly paying their share. Thus, we have started on a program to audit tax contributions and compensation reported under the Railroad Unemployment Insurance and Railroad Retirement Acts.[5]

Burlington, through its employees, and Doyle, through his assistant, had an entry conference on April 17, 1990, at which time the assistant, Mr. Santella, elaborated on Doyle's intent and purpose in conducting the audit:

> Mr. Santella stated that although the OIG [Doyle] had completed 14 audits of other railroads, BN [Burlington] would be the first railroad to experience the combined efforts of the OIG and the IRS [Internal Revenue Service] in that regard. He stated that even though the IRS would have someone working with the OIG audit, the IRS was still a separate agency and the OIG audit would not be considered as an IRS audit. Mr. Santella listed the following areas as the principle [sic] focus of the audit: proper and timely payment of taxes; proper employee relationships (that is, proper employer and employee status treatment); and proper employer compensation and withholding of Tier I and Tier II railroad retirement taxes, which he said they would tie back to the CT–1 reports BN files. Mr. Santella also stated that the OIG final report would be given to the IRS for any assessment of taxes against BN.[6]

By letter dated April 30, 1990, to Mr. Santella, Burlington sought clarification "as to the authority, scope, objectives and procedures in regard to the current Inspector General audit being conducted in our St. Paul office."[7] Doyle responded by letter of May 4, 1990, to Burlington, giving the following explanations of the purpose and

---

3. *In re Office of Inspector General, Railroad Retirement Board,* 933 F.2d 276 (5th Cir.1991).

4. *Id.* at 278.

5. Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint and for Summary Enforcement of an Administrative Subpoena, ex.

A, attach. 7 (hereinafter "Defendants' Motion to Dismiss").

6. Wiggin affidavit (filed 2/4/91), at 12.

7. Defendants' Motion to Dismiss, ex. A, attach. 8.

objectives of the audit and of the use to be made of the audit results:

1. The Inspector General of a government agency conducts audits and investigations relating to administration of agency programs as deemed necessary. In this regard, the Office of Inspector General RRB entered into an agreement with the Internal Revenue Service to conduct reviews relating to railroad employers' compensation reports, and the Forms CT–1, Employers's [sic] Annual Railroad Retirement and Unemployment Repayment Tax Return.

This memorandum constitutes an agreement voluntarily entered into by the Assistant Commissioner (Examination), Internal Revenue Service (IRS) and the Office of Inspector General (OIG), Railroad Retirement Board (RRB). It is recognized that the cooperative efforts of both the IRS and the OIG will be directed at examining/reviewing employment taxes of railroad employers.

2. Our primary objectives of the audit are to determine: (1) proper and timely payment of tax contributions for all employees eligible to be covered under the RUIA and RRA, and (2) the accuracy of compensation and service reports for both RUIA and RRA coverage. This would include the accuracy in reporting creditable compensation, and identifying tax non-compliance as it relates to the RRTA and RUIA.

. . . .

4. Preliminary findings will be discussed on an ongoing basis. In addition, a draft report will be provided by the OIG and the railroad will have an opportunity to respond to the findings and recommendations in writing. Copies of the final report will also be distributed within the RRB and to the IRS. Other copies of our report provided to outside government agencies do not identify the railroad employer by name. Information provided during the course of the audit is protected from disclosure except as provided by law. The RRB has the authority to assess any additional taxes relating to the RUIA and to require compensation adjustment reports as needed. The IRS will report and assess any additional taxes relating to the RRTA based on our examination. Appeal rights relating to the RRTA are as provided in the IRS Code.[8]

The agreement/memorandum between Doyle and Internal Revenue Service to which Doyle referred is a memorandum of understanding that was entered into between Doyle and IRS in late 1989.[9] This memorandum outlines its purpose and policy and the responsibilities of Doyle and IRS as follows:

PURPOSE

This agreement is to establish policy for the IRS and the OIG [Doyle], RRB [Railroad Retirement Board] with regard to referral and audit of matters of mutual interest.

. . . .

POLICY

This memorandum acknowledges both the role of the IRS and the statutory mandate imposed by the Inspector General relating to RRB programs and operations.

The spirit of this memorandum is to effect review responsibilities so as to most efficiently utilize the limited resources which are available. To that end, it is recognized that the cooperative efforts of both the IRS and the OIG will be directed at examining/reviewing employment taxes of railroad employers.

RESPONSIBILITIES OF THE OIG

1. The OIG will furnish the IRS with a copy of their annual work plan relating to railroad employer reviews.

2. The OIG will conduct reviews relating to railroad employers' compensation reports and the Forms CT–1, Employer's Annual Railroad Retirement and Unemployment Repayment Tax Return. These reviews, by the OIG,

---

**8.** Lerner affidavit (filed 2/4/91), ex. C.

**9.** Defendants' Motion to Dismiss, ex. D.

are not an examination in the same meaning as an examination by an IRS examiner.

3. The OIG will request technical assistance from the IRS as needed.

4. The OIG will furnish the IRS Railroad Industry Specialist a copy of each final report.

RESPONSIBILITIES OF THE IRS

1. The IRS will designate a coordinator for OIG railroad employer review activities. This coordinator will be the IRS' Railroad Industry Specialist, located in the St. Louis District. Mr. Gary Kuper currently holds this position and can be contacted at (314) 279-3093.

2. The IRS will provide technical assistance to the OIG in conjunction with their railroad employer review activities. The technical assistance will be requested through the railroad industry specialist located in the St. Louis District. All assistance requests should be forwarded to:

District Director

Internal Revenue Service

P.O. Box 1548

St. Louis, MO 63788

ATTN: Railroad Industry Specialist

RESPONSIBILITIES CONCERNING JOINT EXAMINATIONS BY THE IRS AND OIG

The IRS and OIG may agree to enter into joint examination/reviews in appro-

priate circumstances. The specific details, including resources to be committed and the delegation of responsibility, will be determined prior to the commencement of the joint activity. Participating personnel will be supervised by their respective agencies.

Annually, the OIG will provide the IRS with their annual work plan including the name and addresses of the railroad employers to be reviewed. IRS will compare annual plans and notify the RRB of any examinations that may be done jointly.[10]

Thus, the explanations Doyle initially gave for conduct of the audit in question did not include any oversight element but, rather, made quite clear that the audit was a regulatory audit that had as its goal the carrying out of program responsibilities of the Board and IRS. There was no hint that any of the audit activities had as an objective a "spot check", or any other activity, that was designed to test the adequacy of review or other audit procedures that were being employed by the Board.

### III.

*Doyle's Second Thoughts as to the Nature and Purpose of his Audit of Burlington*

Because Burlington had taken issue with his authority to conduct the audit, Doyle presented the matter to an Assistant Attorney General for advice.[11] As a result, the

---

10. *Id.*

11. The events that led to the advice given by Assistant Attorney General Barr are described by the transcript of testimony given by Mr. Doyle in Washington, D.C., on June 29, 1990, as follows:

Therefore, our audits will include continuing reviews of the nation's class one and short-line railroads.

However, we have recently encountered problems in carrying out these railroad audits. Recently, our Office of Audit commenced an on-site audit of a class one railroad. Shortly after commencement of that audit, the legal department of the railroad began corresponding with us questioning our authority to conduct such an audit.

The reaction by this railroad is sparked by a legal ruling from the Office of Legal Counsel, Department of Justice, which raised questions

relative to authority to conduct certain investigations. The Chairman of the Railroad Retirement Board Glen Bower, along with myself, and members of my staff, met with the Department of Justice to assure them that our railroad audits are a proper exercise of our statutory authority.

Office of Legal Counsel has agreed that audits of the nation's railroads are proper spot checks to ensure compliance by the railroads in the payments and deposits of employment taxes.

The Justice Department has lent their full support to us in any litigation that would ensue from recalcitrant railroads that resist our audit efforts.

I might add that at present we are preparing to subpoena this railroad to turn over their books and records to us so that we can commence this audit. This is being done with the

suggestion was made to Doyle in a May 10, 1990, letter from Assistant Attorney General Barr that Doyle might justify his audit conduct by a contention that his audit activity is "an effort to evaluate the efficacy of the procedures used by the Board." [12] In this same letter, the thought was expressed that an inspector general may "conduct 'spot checks' of agency actions, by investigating particular instances in which regulated persons have failed to comply with regulatory requirements." [13] Doyle promptly picked up on these suggested justifications for the audit. On May 14, 1990, he sent to Burlington a copy of Mr. Barr's May 10 letter. The Barr suggestions have been carried forward into the papers filed on behalf of Doyle in this case, though with a degree of inconsistency. In the memorandum Doyle filed January 18, 1991, in support of his motion for summary enforcement of the subpoena he acknowledged that the real purpose of an audit was of a regulatory nature, saying:

> The purpose of the audit is to obtain records that will enable the IG to determine the accuracy of compensation and creditable service reports filed by BN with the Board, and to determine whether BN is making its proper contributions pursuant to the Railroad Retirement Tax Act and the Railroad Unemployment Insurance Act. Underreporting of compensation, or other items that BN must certify to the Board, results in smaller payments to United States Treasury accounts that fund railroad employees' retirement, sickness and unemployment benefits. Smaller benefits payable to eligible employees may result as well.

. . . .

> Here, the purpose of the audit is to determine if compensation reports are accurate and determine if taxes have been properly paid in support of the RRA and the RUIA. [14]

The explanation on page 13 of the memorandum of certain oversight type uses that could be made of the audit information does not detract from the memorandum's unqualified statements of the regulatory nature of the audit.

Similarly, the statements made in the Skvarek declaration filed January 18, 1991, in support of Doyle's request for summary enforcement of subpoena give as the purpose of the audit performance of regulatory functions and relegate the potential oversight role of the results of the audit to a coincidental position:

> 15. The purposes of the audit of BN were to (a) determine that BN is making proper and timely payment of tax contributions for all employees eligible to be covered under the RRTA and RUIA, and (b) determine the accuracy of compensation and service reports for both RUIA and Railroad Retirement Act ("RRA") coverage. The results of the audit will help the OIG also to evaluate the effectiveness of the Board's procedures and operations since it will supply the OIG with information upon which to base final conclusions concerning the extent of noncompliance by railroads, and assist the OIG in determining whether to recommend changes in the Board's procedures for reviewing reports and collecting the required payments. [15]

full support and cooperation of the Department of Justice.

Lerner affidavit (filed 2/4/91), ex. J, pages 32–33. The juxtaposition of the testimony that Doyle's audits "include continuing reviews of the nation's class one and short-line railroads" with his statements that "Legal Counsel has agreed that audits of the nation's railroads are proper spot checks to ensure compliance by the railroads in the payments and deposits of employment taxes" emphasizes a fallacy in Doyle's position in this case. The fact that Doyle's reviews of the nation's railroads are continuing provides an inherent conflict with the "spot

check" theory suggested by Assistant Attorney General Barr.

12. *Defendants' Motion to Dismiss*, ex. A, attach. 11.

13. *Id.* at 2.

14. Memorandum in Support of Motion to Dismiss Plaintiff's Second Amended Complaint, in Support of Motion for Summary Enforcement of Administrative Subpoena and in Response to the Brief of the Amicus Curiae, at 2 & 23.

15. *Defendants' Motion to Dismiss*, ex. A, at 6–7.

Doyle became bolder in his mid-March 1991 unverified memorandum in which he unqualifiedly adopted the "spot check" justification Assistant Attorney General Barr suggested in his May 10, 1990, letter. At page 3 of defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and Reply to Plaintiff's Response to Defendants' Motion to Dismiss, Doyle says:

> BN's contention that such an audit is a program operating responsibility which, under the IG statute, can be performed only by the RRB is wrong. In pressing this claim, BN ignores the fact that the IG is auditing BN: (1) as part of an investigation into the existence of fraud or abuse in RRB's programs not investigated by RRB compliance offices, and (2) as part of a "spot check" that will enable the IG to make recommendations to improve the efficiency of RRB programs and operations....

The court finds that the "oversight" justifications that were suggested to, and adopted by, Doyle after the dispute arose and when the matter was in a litigation posture are not credible when the entire evidentiary record is considered. The initial explanations Doyle gave for nature and conduct of the audit are the only credible ones contained in the record. They are verified by overwhelming objective evidence.

## IV.

*The Objective Evidence that Verifies that the Proposed Audit is of a Regulatory, Rather than Oversight, Nature*

When Doyle appeared before a congressional subcommittee on April 4, 1990, he included the following explanations in the descriptions he gave of his railroad audit practices:

[O]ur audit plan includes continuing reviews of the nation's 18 largest railroads.... To date, we have reported on widespread non-compliance of payroll taxes.... [16]

> ....

With the resources we have right now in the last year, utilizing all of the auditors we have on the auditing of railroads, we have audited 13 railroads out of that universe. *We would hope that we would be able to get the—especially the Class I railroads down to a cycle of six years,* best guess, *five years on a routine basis,* we would be able to do that.[17]

> ....

In addition, we will continue to perform payroll audits of the railroad employers as employment taxes are the primary source of funding for the trust funds.[18]

> ....

We are kind of in a growing state, if you will, with IRS in terms of developing memorandums of understanding, in terms of in the past, IRS would never accept audits that were done by anyone other than IRS, and where we are doing audits, for example, of the employment taxes now, IRS has given us permission, so to speak, for those to be accepted.

In the past, if we had taken one of our audits and said a railroad owes us x amount of money, IRS would not accept that. They would have to go out and do their own audit and then assess interest and penalties.

So I think we are in a very challenging time, because there are a lot of sensitive areas with tax information that IRS is very skittish about allowing other Federal agencies to become involved. But because of the nature of what we do, we already collect taxes on unemployment.

*One of the things that we are recommending that would maybe give the record [sic] even more control over tax-*

---

**16.** Transcript of testimony of Doyle before the Subcommittee on Labor, Health and Human Services, Education and Related Agencies of the Committee on Appropriations, U.S. House of Representatives (copy attached as ex. A to Brief of Association of American Railroads as *Amicus Curiae* in Support of Respondent), at 1242.

**17.** *Id.* at 1249 (emphasis added).

**18.** *Id.* at 1262.

*es and not losing money is that we collect taxes ourselves. We already do it.* We have some experience. It would be a gigantic effort, but we also might be able to account for our funds more accurately.[19]

. . . .

Increased staffing will enable us to . . . expand our audit coverage of major railroad employers. . . .

Office of Inspector General efforts will be heightened in the following areas:

.      .      .      .      .

—Railroad tax compliance audits.[20]

. . . .

In FY 91, the Office of Audit will concentrate its efforts in the following areas:

Expansion of the audit coverage of the largest railroads, through the audit of the accuracy of payroll taxes paid by these employers. . . .[21]

. . . .

Fiscal Year 1989 was the first full year of our program to review the accuracy of payroll taxes paid by the railroad employers. To date, we have completed audits of 8 employers.[22]

Doyle's Audit Guide could not make it any clearer that the purpose of an audit of the kind in issue is not "oversight" but is purely regulatory, though detection of fraud and abuse could be a by-product. The guide explains:

Although the primary purpose of this audit is not the detection of fraud and abuse, the auditor should constantly be on the alert for indications of fraud and abuse and should undertake tests of transactions with this in mind. Any instances of potential fraud should be brought to the attention of the Assistant Inspector General for Audit and no further work should be initiated until so instructed. Care must be taken to avoid any actions which could compromise an individual's rights or the integrity of an official inquiry.

.      .      .      .      .

This guide applies to all employers covered by the RUIA and the Railroad Retirement Act. It is to be used in performing program audits of tax contributions under the RUIA and compensation reported for earnings records under both the RUIA and the RRA.[23]

Needless to say, Doyle's explanations before the congressional subcommittee, and his Audit Guide, do not describe "oversight" or "spot check" audit activity calculated to enable Doyle to make recommendations to improve the efficiency of Board programs and operations. Instead, they describe a usurpation by Doyle of regulatory audit programs. The programs are being performed by Doyle as if he were the primary regulatory agency instead of being an instrument of mere "oversight." Credulity is stretched too much to believe that the audits Doyle and his Audit Guide describe are anything other than the performance of audits that constitute program operating responsibilities of the primary agencies. Doyle's stated effort to take over actual tax collecting functions ("One of the things that we are recommending that it maybe give the record [sic] even more control over taxes is that we collect taxes ourselves. We already do it.") provides insight into the true nature and goal of Doyle's audit activities. He and his questioner became just as expansive during the following exchange:

Mr. Conyers. Now you discovered out of 15 audits of 15 railroads that they owed about 26 million right now?

Mr. Doyle. Correct.

Mr. Conyers. And so it is hard to guess where this is going if we—if we audited all 600, it could get into some pretty big money.

Mr. Doyle. I think that could be a reasonable assumption.[24]

---

19. *Id.* at 1263 (emphasis added).

20. *Id.* at 1268.

21. *Id.* at 1282.

22. *Id.* at 1284.

23. *Amicus Curiae* Brief, ex. B. at 1.

24. Lerner affidavit, ex. K, at 1.

As the legislative history discussed below shows, Congress certainly did not intend that the Act would allow this sort of bureaucratic empire building. The proposed audit in dispute appears to be an integral part of such an endeavor by Doyle.

## V.

### The Limited Power Given to Doyle by the Act

■ The Offices of the Inspector General were intended by statute to be "independent and objective units ... to conduct and supervise audits and investigations relating to the programs and operations of [specified] establishments [including the Railroad Retirement Board]." [25] Each inspector general is given the duty and responsibility with respect to the establishment within which his office is exists, *inter alia*, "to provide policy direction for and to conduct, supervise and coordinate audits and investigations *relating to* the programs and operations of such establishment...." [26] Inspectors general, in carrying out the provisions of the Act, are given the authority "to make such investigations and reports relating to the administration of the programs and operations of applicable establishment as are, in the judgment of the Inspector General, necessary or desirable" and "to require by subpena the production of all information, documents ... necessary in the performance of the functions assigned by [the] Act." [27] The Act causes there to be a transfer of certain functions to the inspectors general including, as to the Board, the Office of Inspector General [as established by section 23 of the Railroad Retirement Act of 1974],[28] and "such other offices or agencies, or functions, powers, or duties thereof, as the head of the establishment involved may determine are properly related to the functions of the inspector general and would, if so transferred, further the purposes of [the] Act, except", as to this general category, *"there shall not be transferred to an Inspector General ... program operating responsibilities."* [29]

When the Act is read in context with its legislative history, there is no doubt that the scope of the inspector general's duties and powers was intended to be severely restricted and that there was no intent by Congress to transfer to an inspector general the responsibility for the enforcement of a program of the primary agency, such as performance of an audit that is an integral part of the program. The report of the House Committee on Government Operations emphasized that "[t]hese offices would have no program responsibilities." [30] The report goes on to explain in a highly definitive statement of congressional intent that:

> While Inspectors General would have direct responsibility for conducting audits and investigations relating to the efficiency and economy of program operations and the prevention and detection of fraud and abuse in such programs, *they would not have such responsibility for audits and investigations constituting an integral part of the programs involved.* Examples of this would be audits conducted by USDA's Packers and Stockyards Administration in the course of its regulation of livestock marketing and *investigations conducted by the Department of Labor as a means of enforcing the Fair Labor Standards Act.* In such cases, the Inspector General would have oversight rather than direct responsibility.[31]

25. 5 U.S.C. app. 3 §§ 2 & 11.

26. *Id.* at § 4(a)(1) (emphasis added).

27. *Id.* at § 6(a)(2) & (4).

28. The now repealed § 23 of the Railroad Retirement Act of 1974 (45 U.S.C. § 231v) created an inspector general for the Board who had powers, duties and limitations identical to those provided by the Inspector General Act of 1978. The purpose of 5 U.S.C. app. 3 § 9(a)(1)(S) was to cause the Act to be directly applicable to the Board rather than to be applicable by adoption.

29. *Id.* § 9(a)(1)(S) & (2) (emphasis added).

30. H.R.Rep. No. 584, 95th Cong., 1st Sess. at 2 (1977).

31. *Id.* at 12–13 (emphasis added).

The intended focus was spelled out in the Report of the Senate Committee on Governmental Affairs:

The Inspector and Auditor General's focus is the way in which Federal tax dollars are spent by the agency, both in its internal operations and its federally-funded programs. Such a responsibility obviously encompasses countless issues. The Inspector and Auditor General should obviously be involved in identifying patterns and perpetrators of programmatic fraud, but allegations that an Assistant Secretary is making decisions which are influenced by a financial conflict of interest would also be a proper concern. The Inspector and Auditor General would also be properly concerned if an audit or investigation turned up indications that agency supervisors or employees were incompetent. The integrity and quality of agency decisionmaking are inextricably intertwined with the economy, efficiency and effectiveness of agency programs and operations.[32]

Congressman Horton reminded that "[i]t is important ... to remember and to realize that this new Office of Inspector General will have absolutely no policy responsibility."[33] Congressman Levitas' comments are even more pointed:

The Inspectors General to be appointed by the President with the advice and consent of the Senate will first of all be independent *and have no program responsibility* to divide allegiances....

Moreover, *the Offices of Inspector General would not be a new "layer of bureaucracy" to plague the public. They would deal exclusively with the internal operations of the departments and agencies.* Their public contact would only be for the beneficial and needed purpose of receiving complaints about problems with agency administration and in the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars.[34]

When it was dealing more objectively with a dispute between two governmental entities, the Department of Labor and its Inspector General, the Department of Justice took a view of the legislative intent of the Act that was consistent with its legislative history.[35] On page one of this March 9, 1989, memorandum, the author expressed the conclusion that *"the Act does not generally vest in the Inspector General authority to conduct investigations pursuant to regulatory statutes administered by [the primary agency]"* and that "the inspector general has an oversight rather than a direct role in investigations conducted pursuant to regulatory statutes: *he may investigate the Department's conduct and regulatory investigations but may not conduct such investigations himself."*[36] The assistant attorney general further explained:

In sum, we think that the legislative history and structure of the Act provides compelling evidence that in granting the Inspector General authority to "conduct and supervise audits and investigations relating to programs and operations" of the department, 5 U.S.C.App. 2(1), *Congress did not intend to grant the Inspector General authority to conduct, in the words of the House Report, "investigations constituting an integral part of the programs involved."* Rather, the Inspector General's authority with respect to investigations pursuant to the Department's regulatory statutes is, again in the words of the House Report, one of "oversight."[37]

In a statement made by Assistant Attorney General Barr at the April 25, 1990, hearing before the Committee on Governmental Affairs, United States Senate, regarding the authority of the inspectors general, he made plain that, in the view of the Department of Justice, any "spot

**32.** S.Rep. No. 1071, 95th Cong., 2nd Sess. at 27–28 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2676, 2702–2703.

**33.** 124 Cong.Rec., 10404 (1978).

**34.** *Id.* at 10405 (emphasis added).

**35.** Defendants' Motion to Dismiss, ex. B.

**36.** *Id.* at 1–2 (emphasis added).

**37.** *Id.* at 11 (emphasis added).

check" authority an inspector general might have does not justify his performance of a function of a program of the agency he is to oversee.[38] Included in Mr. Barr's statements were the following remarks:

> In particular, the legislative history compels the conclusion that the IGs do not have authority conduct investigations that are an "integral part" of the agency's programs....[39]
>
> ....
>
> This conclusion comports with one of the primary purposes behind the Inspector General Act, namely that IGs be independent and objective. *See e.g.,* H.R.Rep. No. 584 at 15. Under the Act, IGs are not to conduct the day-to-day operations of the agencies whose honesty and efficiency they must oversee. IGs, in short, are not to be put in a position where they must oversee themselves.[40]
>
> ....
>
> It would be contrary to the whole purpose of the Act—and profoundly ironic— if the Act were interpreted so that IGs would give up their impartial and independent roles, assume policy and operational responsibilities for agency programs, and become another "layer of bureaucracy" in the federal government.[41]
>
> ....
>
> For example, an IG may investigate not only the actions of the agency and its employees, but also alleged wrongdoing by private parties acting in collusion with such employees. In the course of an oversight investigation, an IG may also conduct "spot checks" of agency actions, by investigating particular instances in which regulated persons have failed to comply with regulatory requirements.[42]

> ....
>
> Since an IG is precluded under the Act from conducting regulatory investigations, it follows that the agency head cannot delegate such authority to the IG, because it is not "properly related" to the IG's statutory functions and would not "further purposes of this Act," as required by Section 9(a)(2).[43]
>
> ....
>
> As previously stated, Congress intended that the IGs would oversee but not conduct agency operations, and we find no basis in the Act or its legislative history for concluding that agency regulatory investigations should be treated any differently in this regard from any other agency operations.[44]
>
> ....
>
> In our view, Congress' interest in preserving the IGs' "independence and objectivity" regarding oversight of an agency's regulatory investigative operations would certainly be threatened if an IG were to undertake some of those operations himself, thereby putting himself in the position of overseeing his own performance of an agency function.[45]

In conclusion, Mr. Barr advised the Committee that the Department of Justice "remain[s] convinced that the OLC Opinion [the March 9, 1989, Department of Justice memorandum] sets forth the correct interpretation of the scope of Inspector General investigative authority under the Inspector General Act." [46]

Nothing in the Act or its legislative history remotely suggests that the Act authorizes Doyle to conduct regulatory audits of railroads of the kind he has undertaken, including the one that prompted issuance of the subpoena in question. His "spot check" theory falls flat on its face when one considers the explanations Doyle ini-

---

**38.** Plaintiff's Response to Defendants' Motion to Dismiss and Motion for Summary Enforcement of Administrative Subpoena and Memorandum in Support of Plaintiff's Motion for Summary Judgment, Appendix of Public Record Documents (hereinafter "Appendix"), ex. 10.

**39.** *Id.* at 3.

**40.** *Id.* at 4.

**41.** *Id.* at 5.

**42.** *Id.* at 6.

**43.** *Id.* at 11.

**44.** *Id.* at 12.

**45.** *Id.* at 12–13.

**46.** *Id.* at 15.

tially gave for the nature and conduct of his proposed audit. Moreover, the objective evidence mentioned in an earlier part of this memorandum opinion exposes as preposterous Doyle's contention that he was doing a "spot check" audit to determine adequacy of review and audit procedures of the Board. As noted above, when Doyle appeared before the congressional subcommittee in April 1990 he already had conducted enough audits and reviews to be able to report "widespread noncompliance of payroll taxes." [47] He already had the information a "spot check" would be calculated to disclose. His duty was to report on the inadequacies about which he already knew rather than to continue with his regulatory audits on a periodic and "routine basis." Doyle's statutory assignment was to oversee the auditing functions of the primary agency, not to perform them for the agency. The financial success of Doyle's auditing activities is not the issue.[48] If it were, the more aggressively an inspector general undertakes to violate the limitations intended to be imposed on his activities by Congress the greater the likelihood that he would succeed in defeating the congressional intent.

## VI.

*Doyle's Subpoena is Related to a Regulatory Audit he is Not Authorized to Make—Therefore, it Should Not be Enforced*

■ While there might or might not be a question as to the effectiveness of the

Board's investigatory and audit activities, the proposition that the Board has the power and duty to conduct whatever review and audit activities are essential to the programs for which it is responsible cannot be disputed.[49] Equally apparent is the fact that Doyle's subpoena directed to Burlington is an infringement on the program operating responsibilities of the Board. The record of this case preponderates in favor of the conclusion that in seeking to perform the audit in question Doyle is trying to engage in performance of a program function of the primary agency, the Board.

Doyle's conduct is at direct variance with Congress' intent when it promulgated the Act. He has improperly assumed a program activity of the Board; he is attempting to become a "new 'layer in bureaucracy' to plague the public"; [50] he is improperly conducting an investigation pursuant to the regulatory statute administered by the Board, rather than to investigate the Board's conduct in regulatory investigations; he is attempting to conduct the investigations himself; and, he is pursuing audit investigations that are an integral part of the Board's programs. Consequently, the subpoena was not issued, and the audit investigation to which it relates is not being done, pursuant to a legitimate purpose. That being so, Doyle has failed to carry his burden to establish the propriety of the subpoena inquiry.[51] The language of the Fifth Circuit in *In re Office of*

---

**47.** *See, supra,* n. 15 and accompanying text.

**48.** The previous document excerpts contain indications that Doyle justifies his conduct of regulatory audits by their financial success. He made the same point in his April 30, 1990, letter report to the chairman of the Board, when, in reference to his ongoing payroll audit activity in cooperation with IRS, he said:

> We have continued our efforts to strengthen our audit and investigative coverage of RRB programs. A Memorandum of Understanding with the Internal Revenue Service was approved to jointly coordinate examinations of employment taxes of railroad employers. We believe this is an important step since payroll audits constitute an area of substantial monetary impact.

Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment and

to Defendants' Reply to Plaintiff's Response to Defendants' Motion to Dismiss, attach, page 2 of 4/30/90 letter from Doyle to Bower. This statement by Doyle is another example of a clear admission by him of the regulatory nature of his "payroll audits," such as the one he is seeking to conduct on Burlington.

**49.** *See* 45 U.S.C. §§ 231f, 358(h) and 362; 20 C.F.R. §§ 200.1(a)(1), (2) & (3), 209.1–.14, 210.7, 211.14, 258.1–.7, 259.1–.7 and 345.24.

**50.** 124 Cong.Rec., 10404 (1978).

**51.** *Cf. U.S. v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964); *In re Equal Employment Opportunity Comm'n,* 709 F.2d 392, 400 (5th Cir.1983).

*Inspector General, Railroad Retirement Board* implies that proof of lack of statutory authority to conduct the planned audit is sufficient reason for not enforcing it. The court said:

> In the case at bar Burlington Northern asserts that the administrative subpoena should not be enforced because the Inspector General lacks the statutory authority to conduct the planned audit of the railroad. Such a defense to the enforcement action requires that the court interpret the relevant statutes; little if any discovery should be required in that endeavor.[52]

If the record shows a lack of statutory authority to conduct the planned audit, as it does in this case, it necessarily fails to show that the investigation will be conducted pursuant to a legitimate purpose. So, whether the matter is viewed from the standpoint of Doyle's burden of proof or as a defensive matter, the same result obtains.

Doyle's second thoughts as to the nature and purpose of his audit of Burlington are not believable under the record of this case, and the court so finds. Even if the conclusion could be reached that a by-product of an unauthorized audit performed by Doyle would be to gain information that might assist Doyle in the performance of legitimate oversight functions, Doyle nevertheless would not prevail. If the audit has an unlawful purpose, it cannot be salvaged by its by-products. Furthermore, the record of this case convinces the court that Doyle's intention and goal was to perform all program audits of railroad employment payroll records himself, with the consequence that he could not possibly have been seeking information that would help him provide "oversight" assistance with respect to payroll audits to be performed by the Board.

The court, therefore, is denying Doyle's request that the subpoena be enforced.

---

**52.** 933 F.2d at 278.

**53.** Second Amended Complaint for Declaratory Judgment, Injunctive Relief, and other Relief, at 10.

## VII.

### *The Request of Burlington for Discovery is Rendered Moot*

Because of the ruling of the court that the subpoena is not to be enforced, the request of Burlington for limited discovery on matters related to enforceability of the subpoena is rendered moot. Therefore, the discovery request is denied. However, the court would note that a significant portion of Burlington's discovery request would be appropriate, and would have been allowed by the court, if the record had not made so clear that the "oversight" and "spot check" justifications advanced by Doyle are mere afterthoughts brought about by the exigencies confronting Doyle when Burlington challenged his authority to conduct the audit.

## VIII.

### *The Complaints of Burlington Concerning Use by Doyle in the Audit Process of a Discredited Audit Employee*

■ The complaint of Burlington indicates that Burlington questions the propriety of the audit in question because it was to be conducted on behalf of Doyle by an assistant inspector general who is under a cloud of charges of misconduct while serving as an audit supervisor in the employ of the Internal Revenue Service.[53] A report on this person's questioned activities is contained in H.R.Rep. No. 800, 101st Cong., 2nd Sess. (1990), entitled "Misconduct by Senior Managers in the Internal Revenue Service."[54] After a study of this report, the court shares the puzzlement of Burlington as to why a person such as this would have been put in charge of the proposed audit; but, the court is of the opinion that the facts about this person and his activities do not supply, under the record as it now exists, independent reason for denying enforcement of the subpoena.

---

**54.** Appendix, ex. 14.

ORDER

For the reasons stated above,

The court ORDERS that the request of Office of Inspector General, Railroad Retirement Board, and the United States of America for enforcement of the subpoena in dispute in this action be, and is hereby, denied, and further ORDERS that such subpoena shall not be enforced; and

The court further ORDERS that the request of Burlington for limited discovery be, and is hereby, denied.

The court is of the opinion and finds that there is no just reason for delay and that there should be entry of a final judgment with respect to the court's denial of the request for enforcement of subpoena.