**INSPECTOR GENERAL, United States Dept. of Housing and Urban Development, Petitioner,**

v.

**BANNER PLUMBING SUPPLY, CO., INC., Respondent.**

No. 98 C 1319.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 11, 1998.

Kurt N. Lindland, Young B. Kim, U.S. Atty's Office, Chicago, IL, for Petitioner.

Mark W. Solock, Chicago, IL, for Respondent.

## MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

Petitioner, the Office of the Inspector General for the Department of Housing and Urban Development ("HUD–OIG"), moves this court for summary enforcement of an administrative subpoena *duces tecum* that it issued to and served on respondent Banner Plumbing Supply ("Banner") on August 5, 1997.

Banner partially complied with the subpoena, which demanded the production of various documents, but has refused to produce a number of these documents on two grounds. First, Banner contends that the OIG has no authority to investigate Banner or to subpoena those records Banner has refused to produce. Second, Banner contends that the OIG subpoenaed the records for an improper purpose. For the following reasons, the court grants HUD–OIG's motion for summary enforcement and denies Banner's request for relief.

## I. BACKGROUND [1]

On October 19, 1993, the Chicago Housing Authority ("CHA"), then an Illinois Municipal Corporation subject to the supervision and regulation of the Illinois Housing Authority,[2] awarded Banner a contract to supply and deliver plumbing and heating-related supplies. That contract required Banner to provide requested plumbing supplies at a 54.11% discount off the manufacturers' list prices, as defined by the trade guide "Trade Service's Modern Contractor's Trade Net Guide." From October 1993 to October 1994, the time period at issue, Banner provided various supplies to CHA, and the CHA paid Banner $1,689,965.27 pursuant to the contract. CHA also received federal funds during this time period. Specifically, HUD provided CHA with federal funds via its Comprehensive Grant Program and its operating subsidy fund, funds that were commingled with other monies in CHA's general operating revenues. CHA paid Banner out of these general operating revenues.

In early 1994, CHA's Office of Inspector General ("CHA–OIG") obtained information suggesting that Banner was violating the contract by supplying products that were inferior to those billed pursuant to CHA's audit of all plumbing supplies in its warehouse. According to Banner, the CHA's director then "unilaterally empowered" a CHA employee, "designated as the inspector general," to subpoena contractor records. Re-

1. The court takes the facts included in this section from the parties' pleadings and attached affidavits, indicating which facts and allegations are contested.

2. On or before June 2, 1995, CHA apparently came under the control of HUD.

spondent's Memorandum at 2. This employee then issued a subpoena to Banner requesting several documents. Banner produced contracts with the CHA pertaining to the relevant time period, purchase orders it received from CHA, invoices it had sent to CHA, and the relevant trade guide. Banner refused to produce its financial statements; tax records; records of payments received form the CHA; and records of purchases from suppliers, including purchase orders, invoices, and payment records.

The CHA subsequently filed an action in Cook County Circuit Court to enforce the subpoena. On September 7, 1995, Judge Reid ruled in favor of Banner, sustaining Banner's objections to the subpoena in finding that the disputed documents were "confidential and proprietary information and not the proper subject for disclosure pursuant to said Administrative Subpoena and Petition to Enforce." Respondent's Memorandum, Exhibit B at 1. By this point, Banner contends, HUD had gained control of CHA and, disappointed by the ruling, improperly requested at some later date that HUD–OIG use its subpoena power to gain access to the disputed documents, thereby circumventing Judge Reid's ruling.

HUD–OIG admits that it learned about concerns regarding Banner's conduct in regard to the CHA contract from other sources, specifically, from CHA–OIG and the U.S. Attorney's Office ("USAO"), both of which, according to HUD–OIG, "requested HUD–OIG's assistance in their investigation of Banner for violation of the False Claims Act." Petitioner's Memorandum at 3. Upon reviewing the facts, however, HUD–OIG maintains that it "determined that it had an independent investigative interest in determining whether Banner defrauded the CHA and HUD." *Id.* Accordingly, in July 1997, HUD–OIG commenced its own investigation of Banner for violations of the federal False Claims Act, 31 U.S.C. § 3739 et seq.

After concluding that it needed to examine various documents related to the contract, HUD–OIG issued the subpoena *duces tecum* now at issue. HUD–OIG's request appears to be coextensive with the subpoena that CHA had issued, which means HUD–OIG's subpoena requests the same documents that Judge Reid denied CHA. Banner has taken the same position with respect to HUD–OIG's subpoena as with the CHA subpoena. Accordingly, the same documents previously in dispute are now the subject of the dispute in this court.

HUD–OIG contends: 1) that it has authority to issue the subpoena; 2) that it has complied with the relevant procedural requirements for issuance; 3) that the disputed documents are relevant as necessary to support (or eliminate) its suspicion that Banner violated the False Claims Act or other applicable laws, regulations, and HUD requirements; and 4) that the subpoena is neither unreasonably broad nor burdensome. Banner apparently contests only the first of these points, namely, that HUD–OIG lacks the authority to subpoena the disputed documents. Banner further contends that HUD–OIG issued the subpoena for an improper purpose.

## II. ANALYSIS

■ As an initial matter, the court notes that the Seventh Circuit has described the court's role in a subpoena enforcement proceeding as "sharply limited." *EEOC v. Tempel Steel Co.,* 814 F.2d 482, 485 (7th Cir. 1987). Generally, administrative subpoenas will be enforced as long as the subpoena: 1) is within the agency's statutory authority; 2) seeks information reasonably relevant to the inquiry; 3) is not unreasonably broad or burdensome; and 4) seeks information the government does not presently possess. *See U.S. v. Powell,* 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *see also EEOC v. Quad/Graphics, Inc.,* 63 F.3d 642, 645 (7th Cir.1995) (stating that courts generally will "enforce an administrative subpoena if it seeks reasonably relevant information, is not too indefinite, and relates to an investigation within the agency's authority"). As Banner contests only one prong of this test—HUD–OIG's authority to issue the subpoena—the court will not discuss the other prongs.

Banner contends that HUD–OIG lacks authority to investigate and issue a subpoena to Banner. According to Banner, HUD–OIG's authority to investigate does not reach it

because it contracted with CHA, an Illinois Municipal Corporation, rather than with HUD, a federal entity. Banner claims that HUD cannot "regulate the individual contractors whom the local authorities contract with for the purchase of needed goods." Respondent's Memorandum at 5. HUD–OIG, however, contends that it has both the responsibility and authority to investigate Banner and subpoena documents under Banner's control because it must ferret out fraud and abuse in programs that receive HUD, i.e., federal, money. Banner counters by arguing that it did not participate in HUD's low-income housing program. According to Banner, "entering into an agreement with a local housing authority and being paid by that authority from its general operating revenues" does not constitute participation in HUD's low-income housing program. *Id.* at 6. Banner further argues that any funds it received from CHA in payment on the contract cannot be considered federal funds. According to Banner, the funds HUD gave CHA "los[t] their identity as federal funds" because they constituted only a small percentage of CHA's general operating revenues and were commingled with monies from other sources. *Id.* at 7.

The court finds that HUD–OIG has authority to investigate Banner and issue the subpoena in question. Congress has given HUD–OIG the "duty and responsibility" to "conduct, supervise, and coordinate audits and investigations relating to the programs and operations of [HUD]" and to "conduct, supervise, or coordinate other activities carried out or financed by [HUD] for the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in, its programs and operations." 5 U.S.C.App. 3 § 4(a)(1) & (3); *see also Inspector General, U.S. Dept. of Housing and Urban Development v. St. Nicholas Apts.*, 947 F.Supp. 386, 389 (C.D.Ill. 1996). The Inspector General may institute an investigation "relating to the administration of the programs and operations of [HUD]" if, "in the judgment of the Inspector General," such investigation is "necessary or desirable." 5 U.S.C.App. 3 § 6(a)(2). Accordingly, an Inspector General may investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *St. Nicholas Apartments*, 947 F.Supp. at 389 (citing *U.S. v. Morton Salt*, 338 U.S. 632, 642–43, 70 S.Ct. 357, 94 L.Ed. 401 (1950)).

HUD–OIG has the authority to investigate Banner because Banner has received money originating from an authorized HUD program and HUD–OIG suspects that ·Banner has violated the federal False Claims statute or has otherwise defrauded the federal government. Congress has given HUD statutory authority to provide funds to public housing agencies to help them modernize public housing, 42 U.S.C. § 14371, which HUD does through its Comprehensive Grant Program, as well as the authority to provide such agencies specifically with funds to cover the costs of operating public and low-income housing projects, 42 U.S.C. § 1437g, which HUD does through its operating subsidies program. HUD provided federal funds to CHA under both of these programs, and CHA used some of those funds to pay Banner for plumbing supplies, a cost of improving and operating housing projects. Once HUD disbursed federal funds to CHA for improving and operating public housing, HUD–OIG came under an obligation to investigate allegations of fraud in where that money went. And that is precisely what HUD–OIG seeks to do in this case.

The court rejects Banner's argument that HUD–OIG's authority to investigate does not extend to Banner because it contracted with CHA rather than with HUD. Banner has provided this court with no authority holding that an Inspector General may not investigate a party who contracts with a local housing authority, and this court is aware of no such authority. Indeed, the only cases Banner cites—*U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), *U.S. v. Candella*, 487 F.2d 1223 (2d Cir.1973), and *U.S. v. Beasley*, 550 F.2d 261 (5th Cir. 1977)—all *sanctioned* federal government pursuit of parties under federal false claims statutes even though those parties had contracted with state or local authorities because the parties were paid at least in part with funds the federal government provided to the

state or local authority.[3] Moreover, as cases like *St. Nicholas* and *Morton Salt* indicate, an Inspector General's investigative authority is broad and may be predicted solely on a suspicion of illegality.

The court also rejects Banner's argument that the federal funds HUD provided to CHA lost their identity as federal funds because they represented only a small percentage of CHA's general operating revenues and were commingled with funds from other sources. Banner cites absolutely no authority for this proposition, and the court is aware of none. Moreover, the statute, which broadly authorizes inspection to ferret out fraud and abuse, imposes no such limitations on an Inspector General's investigative power.

Having found that HUD–OIG has the authority to investigate Banner, the court also finds that it has the authority to issue a subpoena to Banner. The Inspector General Act of 1978 grants Inspector Generals the authority to require by administrative subpoena the production of records "necessary in the performance of the functions assigned by [the] Act" and further provides that such subpoenas "shall be enforceable by order of any appropriate United States district court." 5 U.S.C.App. § 6(a)(4). Courts have construed this subpoena power broadly.[4] *See, e.g., U.S. v. Aero–Mayflower Transit Co.*, 646 F.Supp. 1467, 1472 (D.D.C.1986) (noting that the subpoena power is extensive and that it may serve as the most important tool for ferreting out waste, fraud, and abuse), *aff'd*, 831 F.2d 1142 (D.C.Cir.1987); *U.S. v. Westinghouse Elec. Corp.*, 788 F.2d 164, 170 (3d Cir.1986) (holding that "[a] constricted interpretation [of the subpoena power] would be at odds with the broad powers conferred on the Inspector General by the statute"). In order to investigate the alleged fraud in this case, HUD–OIG will undoubtedly find helpful documents showing what items Banner ordered from its suppliers, for instance, so that HUD–OIG can compare these items with those that it actually received.[5]

Banner's citation of *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 103 S.Ct. 1587, 75 L.Ed.2d 580 (1983), does not persuade this court to the contrary. *Bowsher* addressed the General Accounting Office's right to demand access to documents, not the Inspector General's subpoena power. Both the GAO and Inspectors General may request documents pursuant to investigations for fraud or abuse, but the statute granting the GAO access rights does so in a limited fashion, in stark contrast to the broad wording of the Inspector General Act. *See Bowsher*, 460 U.S. at 831, 103 S.Ct. 1587 (holding that Congress in relevant part limited GAO's access power to documents that "directly pertain to and involve transactions relating to, the contract or subcontract"). No such limitation exists in the Inspector General Act.

■ The court also rejects Banner's second ground for refusing to produce the documents in question: its contention that HUD–OIG issued the subpoena for an improper purpose. In this regard, Banner argues that HUD–OIG has conceded that "HUD and the U.S. Attorney first requested OIG to obtain

---

**3.** To the extent that Banner attempts to carve out from this line of cases a rule that an administrative subpoena cannot be enforced against a party who contracts with a state or local authority where 1) the contractor does not know that the federal government shoulders some of the costs and 2) the federal government does not directly reimburse the state or local government, the court rejects such a rule in the context of administrative subpoenas. *Marcus, Candella,* and *Beasley* involve the propriety of conviction under federal false claims statutes, not the propriety of issuing an administrative subpoena. While the issue of a contractor's knowledge goes to the question of the contractor's specific intent to defraud the federal government and thus to the propriety of conviction for making a false claim,

it has nothing to do with the enforceability of an administrative subpoena.

**4.** Indeed, some case law suggests that the subpoena power reaches even third parties "not expressly within [an agency's] regulatory jurisdiction," provided that the agency seeks information "relevant and necessary to the effective conduct of [its] authorized and lawful inquiry." *See U.S. v. Art Metal–U.S.A., Inc.*, 484 F.Supp. 884, 887 (D.N.J.1980).

**5.** As the court previously noted, as to the subpoena, Banner challenges only HUD–OIG's issuing authority and does not argue that the documents therein requested are irrelevant to HUD–OIG's investigation. Accordingly, the court need not discuss relevancy.

the records before OIG initiated this investigation and issued their subpoena" and that this concession demonstrates that HUD–OIG had an improper purpose in issuing the subpoena. Banner further argues that HUD is using HUD–OIG's investigatory powers to perform HUD's regulatory operations, an activity Banner contends is inappropriate given HUD–OIG's mandate to audit and supervise HUD. The court disagrees on both counts.

First, the court finds that HUD–OIG has not conceded that either HUD or the USAO asked HUD–OIG to subpoena the disputed records. Rather, HUD–OIG has stated that "CHA–OIG and the United States Attorney's Office requested HUD–OIG's assistance in their investigation of Banner for violation of the False Claims Act." Petitioner's Memorandum at 3. *See also id.* at Exhibit 1 ¶¶ 12, 17 (Declaration of Special Agent Marguerite Smith) (averring that CHA–OIG and the USAO requested HUD–OIG's participation in investigating Banner). As an initial matter, the court notes that Banner seems to be conflating HUD and CHA–OIG. HUD–OIG did not state that HUD requested HUD–OIG to obtain the disputed records, Banner's representations notwithstanding. Rather, HUD–OIG said that *CHA–OIG* (not HUD) approached HUD–OIG with information about Banner's conduct.

Banner also incorrectly argues that HUD–OIG has conceded that HUD and the USAO "requested OIG to obtain the records before OIG initiated this investigation and issued their subpoena." *See supra.* HUD–OIG has never indicated that *anyone* requested it to obtain the disputed records or to issue the subpoena. Rather, HUD–OIG has stated that CHA–OIG and the USAO requested HUD–OIG's help *in their investigation. See supra.*

The court further rejects Banner's suggestion that HUD–OIG's investigation and subpoena have somehow been rendered illegitimate because other entities first brought the matter to HUD–OIG's attention and requested HUD–OIG's help in their own investigations. As discussed below, the court is not persuaded that any impropriety exists by virtue of asking HUD–OIG for assistance, and Banner has provided the court with nothing but innuendo to suggest otherwise. Moreover, HUD–OIG has offered an affidavit attesting that HUD–OIG made an independent decision to investigate and subpoena Banner after learning about CHA–OIG's suspicions regarding Banner's conduct.

■ The key question is not how or from whom HUD–OIG learned about Banner but rather whether HUD–OIG has the authority to investigate and subpoena Banner and whether such activity is for a legitimate purpose. Having already found that HUD–OIG has the authority to investigate and subpoena Banner, the court now finds that HUD–OIG's reason for doing so is legitimate. HUD–OIG has stated that it decided to institute its own investigation of Banner pursuant to information it learned when CHA–OIG and the USAO requested HUD–OIG's help in their own investigations of Banner.[6] The court has been given no reason to doubt HUD–OIG's assertion that it made an independent decision to investigate Banner and therefore to issue the subpoena in question.[7] Innuendo and speculation do not suffice to override "the normal presumption of good faith that, in courts of law, government officials still enjoy, that must be refuted by well-nigh irrefragable proof." *See Starr v. FAA,* 589 F.2d 307, 315 (7th Cir.1978). As Banner has provided this court with nothing but innuendo, the court accepts HUD–OIG's assertion of independence. *Accord St. Nicholas Apartments,* 947 F.Supp. at 391 (accepting

6. HUD–OIG Special Agent Marguerite Smith averred that "[i]n February 1997, CHA OIG and the United States Attorney's Office requested HUD OIG participation in its investigation of Respondent. Upon review and discussion of the facts of the case, HUD OIG had an independent investigative interest in determining whether Respondent perpetrated a fraud against the CHA and HUD. As such, HUD OIG commenced a formal investigation of Respondent in July 1997." Declaration of OIG Special Agent Mar-

guerite Smith, Petitioner's Memorandum at Exh. 1 ¶ 19.

7. While the timing of HUD–OIG's investigation might, as in *St. Nicholas Apartments,* "raise concerns regarding the independence of the audit," *see St. Nicholas Apartments,* 947 F.Supp. at 390, the record is devoid of any other evidence suggesting improper HUD–OIG action.

HUD–OIG's assertion of independence where nothing but innuendo supported respondent's claim of improper purpose).

Second, the court rejects Banner's argument that HUD is improperly using HUD–OIG's investigatory powers to perform HUD's regulatory operations and is thereby compromising its independence. HUD–OIG is seeking to investigate a specific allegation of fraud, not to conduct a general screening of CHA contractors in a fishing expedition to catch the lawless. To the extent that Banner relies on *Burlington Northern RR Co. v. Office of the Inspector General*, 767 F.Supp. 1379 (N.D.Tex.1991), to support its position, the court finds the case inapposite and further notes that it actually supports HUD–OIG's position. In *Burlington Northern*, OIG undertook a general audit of railroad companies to determine whether they were properly contributing to various railroad programs. *See id.* at 1380. The Fifth Circuit held that "an Inspector General lacks statutory authority to conduct, as part of a long-term, continuing plan, regulatory compliance investigations or audits." *Burlington Northern*, 983 F.2d 631, 642 (5th Cir.1993). In so holding, the Fifth Circuit specifically distinguished situations in which the Inspector General has specific reason to suspect fraudulent or abusive conduct. *See id.* at 640. Unlike in *Burlington Northern*, the court cannot conclude from the evidence before it that HUD–OIG issued the subpoena in question as a regulatory instrument because HUD–OIG has identified specific reasons for investigating Banner and has further averred that it made an independent decision to investigate and subpoena Banner.[8] *Accord St. Nicholas Apartments*, 947 F.Supp. at 390 (finding *Burlington Northern* inapposite

where HUD–OIG instituted "an audit of a particular HUD insured mortgagor which was suspected of equity skimming" rather than conducting the audit as "part of a long-term, nationwide audit").

The court similarly finds that HUD–OIG's interaction with the USAO has not been improper.[9] Once again, Banner incorrectly characterizes HUD–OIG's assertions about its interaction with the USAO regarding Banner's conduct. Banner states that "the OIG concedes that they were asked by the U.S. Attorney to obtain records on behalf of the U.S. Attorney and to aid in an investigation of Banner." Respondent's Memorandum at 11. What HUD–OIG actually stated, however, as indicated above, is that the USAO requested HUD–OIG's assistance in investigating Banner. Moreover, Banner has cited this court to, and the court is aware of, no authority holding that cooperation and/or coordination between an Inspector General and the USAO is improper. Indeed, analogous authority is to the contrary. *See, e.g., Aero Mayflower Transit Co.*, 831 F.2d at 1146 (stating that "no body of law, whether statutory or regulatory, explicitly or implicitly restricts the Inspector General's ability to cooperate with divisions of the Justice Department exercising criminal prosecutorial authority"). Moreover, at least some degree of cooperation appears necessary given the statutory requirement that Inspectors General "report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of Federal criminal law." 5 U.S.C.App. 3 § 4(d).

Nor does the court find impropriety in HUD–OIG's decision to seek the same docu-

8. In addition to Special Agent Smith's declaration, HUD–OIG further specified in its reply brief that it "commenced its investigation of potentially fraudulent activities by Banner on the basis of information provided by the United States Attorney's Office, and, thus, the OIG's investigation does not constitute a regulatory compliance audit." Petitioner's Reply at 10.

9. To the extent that Banner relies on *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), to support its contention of improper cooperation, the court finds this reliance misplaced. In *Marshall*, the Court refused

to permit OSHA to conduct a warrantless inspection of a company's business premises because, among other reasons, the search did not fit the "closely regulated" business warrant exception. *See id.* at 313–15. *Marshall* is obviously distinguishable in several respects, including the fact that no government official is attempting to enter and search Banner's premises without a warrant. Moreover, the court notes that OSHA admitted having no particular reason to search Barlow's, whereas HUD–OIG has specifically asserted suspicions of fraud as grounds supporting the issuance of the subpoena.

ments Judge Reid refused to allow CHA to obtain. Judge Reid refused a CHA request for enforcement of a CHA subpoena; neither HUD nor HUD–OIG were involved. Moreover, Banner has not explained why Judge Reid denied enforcement of the CHA subpoena except to say that he found the disputed documents to be proprietary and confidential and not the proper subject of a CHA administrative subpoena. This court need not arrive at the same decision with respect to HUD–OIG's request for enforcement. No issue of res judicata or collateral estoppel has been raised,[10] and, as the court previously discussed, HUD–OIG has broad investigative and subpoena powers, powers it has properly exercised in this case.

## III. CONCLUSION

For the foregoing reasons, the court grants HUD–OIG's request for summary enforcement of its subpoena *duces tecum.* Banner shall comply with the subpoena by January 11, 1999.

---

10. To the extent that Banner may be trying to suggest that CHA and either HUD or HUD–OIG are in privity, the court notes that Banner has made no showing that CHA was authorized to represent HUD in the adjudication of the issue. *See generally Facchiano Const. Co., Inc. v. U.S. Dept. of Labor,* 987 F.2d 206, 212 (3rd Cir.1993) (holding that HUD and DOL were not in privity for purposes of giving res judicata effect to HUD order debarring contractor so as to preclude subsequent government-wide debarment order by DOL because HUD, which had more limited debarment authority than DOL, did not have authority to represent the U.S. in final adjudication of the issue in controversy: government-wide debarment).