United States Court of Appeals,

Fifth Circuit.

No. 91-7006.

BURLINGTON NORTHERN RAILROAD CO., Plaintiff-Appellee,

v.

OFFICE OF INSPECTOR GENERAL, RAILROAD RETIREMENT BOARD, Attorney General of the United States, and the United States of America, Defendants-Appellants.

Feb. 16, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before VAN GRAAFEILAND,[*]* KING, and EMIO M. GARZA, Circuit Judges.

KING, Circuit Judge:

This appeal concerns the enforceability of a subpoena duces tecum issued by the Inspector General of the Railroad Retirement Board to Burlington Northern Railroad Company. The district court refused to summarily enforce the subpoena, concluding that the Inspector General issued it in aid of an ultra vires regulatory compliance audit. Because (i) the district court did not clearly err in determining that the Inspector General in fact issued the subpoena in aid of a regularly scheduled, tax compliance audit, and (ii) the Inspector General lacks statutory authority to conduct such tax compliance audits, we affirm the district court's decision denying summary enforcement of the subpoena.

## I. BACKGROUND

A. The Administrative Structure: The Functions of the Railroad Retirement Board and the Office of Inspector General

Before describing the events surrounding the Inspector General's decision to issue a subpoena to Burlington Northern, we outline the administrative functions of the Railroad Retirement Board (RRB) and the Office of Inspector General (OIG). An understanding of their administrative functions is important to the disposition of this appeal because of the potential for their functions to overlap. That is, under the existing administrative structure, the Inspector General, in attempting to perform

---

[*]Senior Circuit Judge for the Second Circuit, sitting by designation.

his statutory oversight duties, could effectively assume the RRB's tax enforcement duties.

1. *The Railroad Retirement Board's Mission*

The RRB is responsible, under separate federal statutes, for distributing two types of benefits. First, the RRB administers retirement and survivor benefits to railroad workers and their families pursuant to the Railroad Retirement Act, 45 U.S.C. § 231, et seq. These retirement-survivor benefits are paid from the Railroad Retirement Account, which is in turn funded by taxes paid by railroad employers under the Railroad Retirement Tax Act, 26 U.S.C. § 3201, et seq. Second, the RRB administers unemployment and sickness benefits to railroad workers under the Railroad Unemployment Insurance Act, 45 U.S.C. § 351, et seq. The unemployment-sickness benefits are paid from the Railroad Unemployment Insurance Account, an account which, again, is funded by taxes collected from railroad employers. The taxes that railroad employers must pay under the Railroad Retirement Tax Act and the Railroad Unemployment Insurance Act are calculated, in part, on the basis of creditable compensation the railroad pays to its employees.

The RRB is also responsible, to some extent, for ensuring that railroad employers are properly paying the taxes that fund the retirement-survivor and unemployment-sickness benefit programs. With respect to the retirement-survivor benefit program, the Internal Revenue Service (IRS) is the agency assigned the responsibility of collecting revenues under the Railroad Retirement Tax Act; however, the RRB, under the Railroad Retirement Act, has the "power to require all employers ... to furnish such information and records as shall be necessary for the administration of this [Act]." 45 U.S.C. § 231f(b)(6). In addition, the RRB may require employers to file compensation reports under the Railroad Retirement Act. *See* 45 U.S.C. § 231h. With respect to the unemployment-sickness benefit program, the RRB is more directly responsible for enforcing railroad employer tax contributions. Specifically, under the Railroad Unemployment Insurance Act, it is the RRB, not the IRS, which has the responsibility for collecting railroad employer contributions to the Railroad Unemployment Insurance Account. Among other things, the RRB may assess deficiencies with respect to employer contributions, may assess interest and penalties for deficiencies, and may impose liens for unpaid amounts. *See* 45 U.S.C. §§ 358, 359; *see also* 20 C.F.R. §§ 345.14-345.19

(1992).

Thus, it is undisputed that, at least under the Railroad Unemployment Insurance Act, the RRB has the power to investigate or audit railroad employers to determine if they are accurately reporting creditable compensation and properly paying taxes. *See* 45 U.S.C. § 362. The problem, at least as far as the Office of Inspector General is concerned, is that the RRB has never exercised this power. Instead, the RRB has historically relied on the IRS's auditing of railroad employers' reports under the Railroad Retirement Tax Act. In other words, the RRB, rather than independently inspecting railroad employers' payroll and accounting records to ascertain whether they are filing accurate compensation reports and paying the correct amount of taxes under the Railroad Unemployment Insurance Act, uses a summary reconciliation procedure. Under this procedure, the RRB compares the compensation reported to it with the compensation reported to the IRS under the Railroad Retirement Tax Act.

2. *The Office of Inspector General's Mission*

According to legislative history, the Inspector General Act of 1978, 5 U.S.C.App. 3, was enacted "to consolidate existing auditing and investigative resources to more effectively combat fraud, abuse, waste and mismanagement in the programs and operations of [various executive] departments and agencies." S.REP. No. 1071, 95th Cong., 2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2676. Congress was particularly concerned, it seems, with evidence indicating that fraud, waste, and abuse in federal departments and agencies were "reaching epidemic proportions." S.REP. No. 1071 at 4. Accordingly, Congress established fifteen "independent and objective"[1] Offices of Inspector General:

(1) to conduct and supervise audits and investigations relating to the programs and operations of the [specified departments and agencies];

---

[1]To accomplish its purpose of making the OIG an independent and objective office, Congress provided that Inspectors General "shall be appointed by the President, by and with the advice and consent of the Senate, without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations." 5 U.S.C.App. 3 § 3(a). To further ensure the independence of Inspectors General, Congress provided that "[e]ach Inspector General shall report to and be under the general supervision of the head of the [department or agency] involved...." *Id.*

(2) to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations;  and

(3) to provide a means for keeping the head of the establishment and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action.

5 U.S.C.App. 3 § 2.

In order that the Inspectors General could carry out their oversight mission, Congress gave them audit and investigative authority.  Under the terms of the Act, Inspectors General are specifically authorized, among other things,

(2) to make such investigations and reports relating to the administration of the programs and operations of the applicable [department or agency] as are, in the judgment of the Inspector General, necessary or desirable;  [and]

(4) to require by subpena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act, which subpena, in the case of contumacy or refusal to obey, shall be enforceable by order of any appropriate United States district court: *Provided,* That procedures other than subpenas shall be used by the Inspector General to obtain documents from Federal agencies.

5 U.S.C.App. 3 § 6(a).  The Act also authorizes the head of the federal department or agency to transfer to its Inspector General other powers or duties that the department or agency head determines "are properly related to the functions of the Office and would, if so transferred, further the purposes of this Act."  5 U.S.C.App. 3 § 9(a)(2).  The only limit in this regard is the command that no "program operating responsibilities" of the department or agency shall be transferred to an Inspector General.  *Id.*

Although the Inspector General Act of 1978 did not create a separate OIG for the RRB, Congress created such an office in 1983.  *See* Pub.L. No. 98-76, Title IV, § 418, 97 Stat. 437 (codified at 45 U.S.C. § 231v).  And, the Inspector General for the RRB has all the investigatory and auditing powers originally provided for in the Inspector General Act of 1978.  *See* 5 U.S.C.App. 3 § 9(a)(1)(S).  Thus, the Inspector General of the RRB has the authority (a) "to make such investigations and reports relating to the administration of the programs and operations of the [RRB] as are, in the judgment of the Inspector General, necessary or desirable," and (b) "to require by subpena the production of all information, documents, reports, answers, records, accounts, papers,

and other data and documentary evidence necessary in the performance of the functions assigned by [the Inspector General] Act." 5 U.S.C.App. 3 § 6(a)(2), 6(a)(4).

B. The Inspector General's Railroad Audit Program

Sometime in 1988 or 1989, the Inspector General of the RRB became concerned about the RRB's procedures for determining the accuracy of railroad employers' contributions to the Railroad Retirement Account and the Railroad Unemployment Insurance Account. The Inspector General apparently believed that the IRS's periodic audits of railroad employers—which checked the accuracy of their reporting under the Railroad Retirement Tax Act—even when coupled with the RRB's summary reconciliation procedures, were not adequate for detecting the underpayment of taxes. Accordingly, in September 1988, the Inspector General began auditing the railroad companies himself.

The results of the Inspector General's initial audits disclosed that each of the railroads audited "had incorrectly reported compensation and had underpaid their taxes and contributions for the covered period." The Inspector General understandably became more concerned. Thus, he decided to conduct additional railroad audits.

In late 1989, after several railroad audits had already taken place, the Inspector General of the RRB entered into a memorandum of understanding with the IRS. The stated purpose of the memorandum was "to establish policy for the IRS and the OIG [of the] RRB, with regard to referral and audit of matters of mutual interest." The memorandum specifically recognized that "the cooperative efforts of both the IRS and the OIG will be directed at examining/reviewing employment taxes of railroad employers." Further, under the terms of the memorandum of understanding, the Inspector General of the RRB agreed to conduct reviews relating to railroad employers' compensation reports, to furnish the IRS with copies of each final report resulting from such reviews, and to "annually" provide the IRS with a copy of its "work plan including the name and addresses of the railroad employers to be reviewed." Finally, in this memorandum of understanding, the IRS and Inspector General of the RRB agreed that the two agencies could "enter into joint examination/reviews in appropriate circumstances."

Soon after entering the memorandum of understanding with the IRS, in March 1990, the Inspector General of the RRB notified Burlington Northern of its intent to audit the company. The audit, according to the Inspector General's notification letter, was part of "a program to audit tax contributions and compensation reported under the Railroad Unemployment Insurance and Railroad Retirement Acts." The letter to Burlington Northern further stated that "[i]t is important that each railroad know the others are properly paying their share."

After having an entry conference with the Inspector General concerning the nature and purpose of the audit, Burlington Northern sought clarification "as to the authority, scope, objectives and procedures in regard to the current Inspector General audit." In response to Burlington Northern's request, the Inspector General explained that (1) it had entered into an agreement with the IRS to conduct reviews relating to railroad employers' compensation reports and tax returns; (2) its primary objectives were to determine proper and timely payment of tax contributions and the accuracy of compensation and service reports; and (3) its final report would be distributed to the RRB and the IRS for tax assessments or adjustments.

C. The Subpoena Duces Tecum Issued to Burlington Northern

Burlington Northern was not satisfied with the Inspector General's response to its request for clarification. In June 1990, Burlington Northern sent a letter to the Inspector General disputing his authority to conduct the audit. Specifically, Burlington Northern expressed its concern that the audit program being conducted by the Inspector General was "a classic exercise of regulatory authority rather than oversight authority" and was "not within the statutory authority of the Office of Inspector General." Burlington Northern therefore declined "to entertain the proposed audit."

In an effort to proceed with the proposed audit of Burlington Northern, the Inspector General issued a subpoena duces tecum to the railroad company. The subpoena directed the "Keeper of Records" of Burlington Northern to appear before the Inspector General on August 14, 1990 and bring with him numerous records—including various payroll records. The face of the subpoena indicates that it was issued in aid of an audit "[t]o determine the accuracy of compensation and creditable service reports for coverage under the Railroad Retirement Tax Act and the Railroad

Unemployment Insurance Act."

D. The Subpoena Enforcement Proceeding

Still disputing the Inspector General's authority to conduct the proposed audit, Burlington Northern filed an action in federal district court in September 1990, seeking declaratory and injunctive relief against the enforcement of the subpoena duces tecum. In response to Burlington Northern's suit, the Inspector General filed a petition for summary enforcement of its subpoena. The district court thereafter consolidated the two cases, and both sides filed motions for summary judgment with respect to the Inspector General's action to enforce the subpoena.

While the motions for summary judgment were pending, Burlington Northern served interrogatories, requests for production of documents, and notices of deposition on the Inspector General's office. The Inspector General, in turn, filed a motion for a protective order prohibiting all discovery in the action, arguing that Burlington Northern had not made the required showing for such discovery. The Inspector General specifically contended that Burlington Northern had not made a substantial showing—as required for obtaining discovery from the agency in a subpoena enforcement proceeding—that the court's process would be abused by the enforcement of the subpoena. The district court disagreed and, on April 2, 1991, directed the Inspector General to comply with Burlington Northern's broad discovery requests.

The Inspector General sought and obtained a writ of mandamus from this court directing the district court to vacate the discovery order and promptly address the enforceability of the subpoena. *See In re Office of Inspector General,* 933 F.2d 276 (5th Cir.1991). In granting the Inspector General's petition for writ of mandamus, we stated:

> In the case at bar Burlington Northern asserts that the administrative subpoena should not be enforced because the Inspector General lacks the statutory authority to conduct the planned audit of the railroad. Such a defense to the enforcement action requires that the court interpret the relevant statutes; little if any discovery should be required in that endeavor.

*Id.* at 278. We recognized the possibility, however, that on return to the district court a "limited, measured amount of discovery" might be appropriate.

Instead of allowing any measure of discovery on our return of the case, the district court promptly addressed the enforceability of the Inspector General's subpoena. *See Burlington Northern*

*Railroad Co. v. Office of Inspector General,* 767 F.Supp. 1379 (N.D.Tex.1991). After reviewing the events leading up to the Inspector General's decision to issue the subpoena to Burlington Northern, the stated reasons for the audit, and other statements made by the Inspector General himself, the district court found that the proposed audit of Burlington Northern was of a regulatory, rather than an oversight, nature. *See id.* at 1381-87. And, further concluding that the Inspector General lacks the statutory authority to conduct a regulatory tax compliance audit, the district court denied enforcement of the subpoena. *See id.* at 1387-91. The Inspector General now appeals the decision denying enforcement of its subpoena.

## II. ANALYSIS

This court has consistently recognized the summary nature of administrative subpoena enforcement proceedings. *See, e.g., In re Office of Inspector General,* 933 F.2d at 277; *In re E.E.O.C.,* 709 F.2d 392, 397-400 (5th Cir.1983). Although the test for enforcement has been phrased in various ways,[2] it is settled that the requirements for judicial enforcement of an

[2]The Supreme Court has set forth various tests for determining the enforceability of administrative subpoenas. In *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946), the Court indicated that an administrative subpoena issued in aid of an investigation would be enforced if (1) the investigation is authorized by Congress and (2) the documents sought are relevant to the inquiry. In *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), however, the Court phrased the enforceability test in a slightly different way. There, the Court held that, to obtain enforcement of a subpoena, the administrative agency must show that: (1) the investigation is being conducted pursuant to a legitimate purpose; (2) the information sought is relevant to the inquiry; (3) the information sought is not already within the agency's possession; and (4) the required administrative steps have been followed. *Id.* at 57-58, 85 S.Ct. at 255. The Court further recognized in *Powell* that an administrative agency cannot, in seeking enforcement of a subpoena, abuse the court's process by issuing the subpoena for an improper purpose like harassment. *Id.* at 58, 85 S.Ct. at 255. Finally, in *United States v. La Salle,* 437 U.S. 298, 307, 98 S.Ct. 2357, 2362, 57 L.Ed.2d 221 (1978), the Court stated that as long as an administrative subpoena or summons is "issued in good-faith pursuit of [a] congressionally authorized purpose[ ]," it is enforceable.

The Courts of Appeals have also phrased the requirements for enforcing an administrative subpoena in varying ways. The Ninth Circuit, for example, has indicated that, in an administrative subpoena enforcement proceeding, the agency must first show that (1) Congress has granted the authority to investigate; (2) procedural requirements have been followed; and (3) the evidence sought is relevant and material to the investigation. "If these factors are shown by the agency, the subpoena should be enforced unless the party being investigated proves the inquiry is unreasonable because it is overbroad or unduly burdensome." *E.E.O.C. v. Children's Hosp. Medical Center,* 719 F.2d 1426, 1428 (9th Cir.1983) (en banc); *accord E.E.O.C. v. Maryland Cup Corp.,* 785 F.2d 471, 475-76 (4th Cir.), *cert. denied,* 479 U.S. 815, 107 S.Ct. 68, 93 L.Ed.2d 26

administrative subpoena are minimal. *See, e.g., Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 216, 66 S.Ct. 494, 509, 90 L.Ed. 614 (1945) (when administrator of agency issues subpoena in connection with his investigative function, the only limits "are that he shall not act arbitrarily or in excess of his statutory authority"); *United States v. Security State Bank & Trust,* 473 F.2d 638, 641 (5th Cir.1973) (holding that administrative subpoena is enforceable if issued in aid of a lawful investigation and if the materials sought are relevant to that investigation). As a general rule, courts will enforce an administrative subpoena if: (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome. *See United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950); *United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 166 (3d Cir.1986); *Federal Election Comm'n v. Florida for Kennedy Comm.,* 681 F.2d 1281, 1284 (11th Cir.1982). Courts will not enforce an administrative subpoena, however, if the above requirements are not met or if the subpoena was issued for an improper purpose, such as harassment. *See United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964); *Westinghouse,* 788 F.2d at 166-67.

This appeal concerns only the first requirement for enforcement—namely, whether the subpoena issued to Burlington Northern is within the statutory authority of the Inspector General of the RRB. The district court concluded that the subpoena in question was not within the Inspector General's power. In reaching this conclusion however, the district court made certain fact findings about the nature of the audit for which the subpoena was issued. Thus, in reviewing the district court's ultimate determination that the Inspector General lacked statutory authority to issue the subpoena to Burlington Northern, we must review: (a) the district court's factual findings concerning

---

(1986). The Eighth Circuit, by contrast, has determined that an administrative subpoena will be enforced if: (1) the subpoena was issued pursuant to lawful authority; (2) the subpoena was issued for a lawful purpose; (3) the subpoena requests information which is relevant to the lawful purpose; and (4) the disclosure sought is not unreasonable. Finally, this court has stated that the inquiry regarding the enforceability of a subpoena "is limited to two questions: (1) whether the investigation is for a proper statutory purpose and (2) whether the documents the agency seeks are relevant to the investigation." *Sandsend Fin. Consultants, Ltd., v. Federal Home Loan Bank Bd.,* 878 F.2d 875, 879 (5th Cir.1989).

the nature of the proposed audit of Burlington Northern and (b) the district court's legal conclusion which was based on those findings.

A. The District Court's Fact Findings Concerning the Nature of the Inspector General's Proposed Audit

As noted above, before the district court concluded that the Inspector General was without authority to issue the subpoena to Burlington Northern, it made certain fact findings concerning the nature of the proposed audit. The district court first found that, at its inception, the proposed audit of Burlington Northern was regulatory in nature. The district court stated that the Inspector General's initial explanations for the audit "did not include any oversight element but, rather, made quite clear that the audit was a regulatory audit that had as its goal the carrying out of program responsibilities of the [RRB] and IRS." 767 F.Supp. at 1383. The district court then found that the Inspector General's oversight justifications for the audit, which were offered only after the dispute with Burlington Northern arose, were "not credible" based on the entire evidentiary record. *Id.* at 1385. The district court further determined that the detection of fraud and abuse in the RRB's programs would have only been a by-product of the proposed regulatory audit. *See id.* at 1386. Ultimately, the district court determined that the proposed audit of Burlington Northern was in the nature of a regulatory tax compliance audit.

On appeal, the Inspector General challenges the district court's findings about the nature of the proposed audit of Burlington Northern. The Inspector General argues specifically that the proposed audit was part of a plan to evaluate the effectiveness of the RRB's summary reconciliation procedures. The Inspector General also contends that the proposed audit would have furthered the goal of detecting fraud and abuse in the RRB's programs. For the following reasons, we reject the Inspector General's challenges to the district courts fact findings concerning the nature of the proposed audit.

We review the district court's fact findings concerning the nature of the proposed audit under the clearly erroneous standard of review.[3] Under this standard, we will not set aside the district

---

[3]The district court apparently made the challenged fact findings concerning the nature of the proposed audit while cross-motions for summary judgment were still pending. Thus, it is at least

court's fact findings unless, based upon the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety," we will not set it aside as clearly erroneous—even if convinced that, had we "been sitting as trier of fact, [we] would have weighed the evidence differently." *Anderson,* 470 U.S. at 573-74, 105 S.Ct. at 1511.

We first review the district court's finding that, at its inception, the proposed audit of Burlington Northern was in the nature of a tax compliance audit. This finding is amply supported by the record. The Inspector General initially informed Burlington Northern that (1) the audit was being conducted as part of "a program to audit tax contributions and compensation reported under the Railroad Unemployment Insurance and Railroad Retirement Acts"; (2) the primary objectives of the audit were the "proper and timely payment of tax contributions" and "the accuracy of compensation and service reports"; and (3) the goal of the audit was to identify "tax non-compliance as it relates to the RRTA and the RUIA." Moreover, when the Inspector General testified at a congressional hearing that was held only two weeks after Burlington Northern was notified about the proposed audit, he made the following statements:

---

arguable that the district court's decision denying summary enforcement of the subpoena amounted to an entry of summary judgment in favor of Burlington Northern. If the district court's decision is viewed as a summary judgment, then it is clear that, in order to make its decision, the district court resolved what were disputed fact issues concerning the nature of the audit.

However, on appeal, the Inspector General—for reasons best known to him—has not chosen to attack the district court's decision as an improperly-granted summary judgment. At no point in his brief does the Inspector General cite the summary judgment standard set forth in Federal Rule of Civil Procedure 56(c). Nor does the Inspector General argue that the district court improperly resolved disputed fact issues. Rather, the Inspector General expressly attacks the district court's findings regarding the nature of the proposed audit under the clearly erroneous standard of review. Accordingly, we review the district court's fact findings on this issue under the clearly erroneous standard. *See Matter of HECI Exploration Co.,* 862 F.2d 513, 518-20 (5th Cir.1988) (recognizing, in context of preemption case, that standard of review may be waived); *Atwood v. Union Carbide Corp.,* 847 F.2d 278, 280 (5th Cir.1988) ("[I]ssues not briefed, or set forth in the issues presented, are waived."), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989).

[O]ur audit plan includes *continuing reviews* of the nation's 18 largest railroads.... To date, we have reported on widespread non-compliance of payroll taxes....

With the resources we have right now in the last year, utilizing all of the auditors we have on the auditing of railroads, we have audited 13 railroads out of that universe. We would hope that we would be able to get—especially the Class I railroads down to a *cycle of six years,* best guess, *five years on a routine basis,* we would be able to do that....

One of the things that we are recommending that would maybe give the record [sic] more control over taxes and not losing money is that *we collect taxes ourselves.* We already do it. We have some experience.

Office of Inspector General efforts will be heightened in the [area of].... *[r]ailroad tax compliance audits.*

*Appropriations for 1991 (Part 7): Hearings Before the Subcomm. on Labor, Health, and Human Services, House Comm. on Appropriations,* 101st Cong., 1st Sess. 1242, 1249, 1263, 1268 (1990) (testimony of William J. Doyle III) (emphasis added). This testimony indicates that the Inspector General's plan was not to conduct "spot checks" of railroads like Burlington Northern, but rather, to assume a regular auditing function to detect tax non-compliance and to perhaps assume a tax collecting function. Based on this testimony and the explanations initially given to Burlington Northern by the Inspector General, we conclude that the district court did not clearly err in determining that the proposed audit of Burlington Northern was, as originally conceived, a tax compliance audit.

We next review the district court's finding that the "oversight justifications" proffered by the Inspector General were not credible. Again, this finding is plausible in light of the record. The record reveals that the Inspector General did not attempt to justify the audit as being a "spot check" necessary to evaluate the RRB's summary reconciliation procedures until being prompted to do so by the Department of Justice. In particular, the record reveals that: (1) when Burlington Northern first questioned the Inspector General's authority to conduct the proposed audit, the Inspector General sought advice from the Department of Justice; (2) the Department of Justice advised the Inspector General that the proposed audit would be authorized "as an oversight audit of the [RRB's] operations and as an evaluation of specific instances in which the efficacy of those operations is being assessed"; and (3) although the Inspector General began arguing—in letters to Burlington Northern and in court documents—that the proposed audit was only a "spot check" of the RRB's summary

reconciliation procedures, the Inspector General also continued to maintain that "the purpose of the audit is to determine if compensation reports are accurate and determine if taxes have been properly paid." Based on the evidence in the record, then, there is some question regarding the Inspector General's sudden adoption of the suggested oversight justification. Accordingly, we will not set aside the district court's finding that the oversight justification was a post-hoc rationalization as clearly erroneous.

We also conclude, based on our review of the record, that the district court did not clearly err in finding that the detection of fraud and abuse would have only been a by-product of the proposed tax compliance audit. The Inspector General never suggested that he had any reason to suspect that Burlington Northern was engaged in fraudulent or abusive reporting. Moreover, the only evidence even mentioning the detection of fraud and abuse is the Inspector General's Audit Guide, which states:

> Although the primary purpose of this audit is not the detection of fraud and abuse, the auditor should constantly be on the alert for indications of fraud and abuse and should undertake tests of transactions with this in mind. Any instances of potential fraud should be brought to the attention of the Assistant Inspector General for Audit and no further work should be initiated until so instructed.

Based on this statement, the district court could reasonably determine that the proposed audit of Burlington Northern was not designed to detect fraud and abuse, but rather, was designed to ensure tax compliance, with the detection of fraud and abuse being only a by-product. In any event, we are not left with a definite and firm conviction that the district court was mistaken in this finding.[4]

Finally, we review the district court's ultimate finding regarding the regulatory nature of the proposed audit of Burlington Northern. This finding, in our view, is also plausible in light of the record. There is evidence that, at its inception, the audit was designed to detect tax non-compliance.

---

[4]By determining that the detection of fraud and abuse would only be a by-product of the proposed audit and that the only credible explanations for the audit were those initially given by the Inspector General, the district court effectively determined that the sole purpose of the audit was to ensure tax compliance. Because we have concluded that these findings are not clearly erroneous, we reject the Inspector General's argument that, under *Lynn v. Biderman,* 536 F.2d 820 (9th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976), the subpoena is enforceable. This is not a case in which the district court found that there were two purposes for the proposed audit—one statutorily authorized and one not. Thus, *Biderman* has no application to this case.

There is also evidence that the proffered oversight justifications were merely post-hoc rationalizations designed to save the proposed audit. And, there is little, if any, evidence suggesting that the audit was designed to detect fraud or abuse by Burlington Northern. Accordingly, we hold that the district court did not clearly err in finding that the proposed audit of Burlington Northern was essentially a tax compliance audit to be conducted pursuant to a long-term, regulatory plan.

B. The District Court's Legal Conclusion Concerning the Inspector General's Lack of Statutory Authority

Having accepted the district court finding concerning the nature of the proposed audit of Burlington Northern, we must now address the district court's legal conclusion. That is, we must determine whether, as a matter of law, the Inspector General is statutorily authorized to issue a subpoena in aid of a regularly scheduled, tax compliance audit of a railroad company. *See Peters v. United States,* 853 F.2d 692, 695 (9th Cir.1988) (scope of an agency's subpoena power is question of law which is reviewed de novo). We conclude, for the following reasons, that the Inspector General is not authorized to conduct such an audit and that, therefore, the Inspector General lacked statutory authority to issue the subpoena duces tecum to Burlington Northern.

Initially, we note that, contrary to the district court's suggestions, the Inspector General Act of 1978 gives Inspectors General *broad*—not limited—investigatory and subpoena powers. *See generally* Kurt W. Muellenberg & Harvey J. Volzer, *Inspector General Act of 1978,* 53 TEMP.L.Q. 473 (1985); Herbert L. Fenster & Darryl J. Lee, *The Expanding Audit and Investigative Powers of the Federal Government,* 12 PUB.CONT. L.J. 193, 199-200, 208-11 (1982). With respect to investigatory powers, Congress specifically authorized Inspectors General "to make such investigations and reports *relating to* the administration of the programs and operations of the applicable [department or agency] as are, *in the judgment of the Inspector General,* necessary or desirable." 5 U.S.C.App. 3 § 6(a)(2) (emphasis added); *see also United States v. Newport News Shipbuilding & Dry Dock Co.,* 837 F.2d 162, 170 (4th Cir.1988) ("[W]here the interests of the government require *broad investigations* into the efficiency and honesty of a defense contractor, the Inspector General is equipped for this task.") (emphasis added); *United States v. Blue Cross & Blue Shield of Michigan,* 726 F.Supp. 1523, 1525 (E.D.Mich.1989) (recognizing that Inspectors General

are given broad statutory powers to conduct audits and investigations of the programs and operations of their respective agencies). And, with respect to the authority to subpoena information, Congress empowered Inspectors General "to require by subpena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence *necessary in the performance of the functions assigned by this Act....*" 5 U.S.C.App. 3 § 6(a)(4) (emphasis added). Thus, we agree with Third Circuit's conclusion that "Congress gave the Inspector General *broad* subpoena power." *United States v. Westinghouse Electric Corp.,* 788 F.2d 164, 165 (3d Cir.1986) (emphasis added); *see also United States v. Medic House, Inc.,* 736 F.Supp. 1531, 1535 (W.D.Mo.1989) (recognizing Inspector General's power to issue subpoena to party suspected of fraud in connection with criminal investigation).

The Inspector General's investigatory and subpoena powers are not, however, without limits. *See* S.REP. No. 1071, *supra,* at 28, 1978 U.S.Code Cong. & Ad.News at 2703 ("Broad as it is, the Inspector and Auditor General's mandate is not unlimited."). For example, an Inspector General's subpoena powers do not encompass the authority to compel the attendance of a witness. *See United States v. Iannone,* 610 F.2d 943, 946 (D.C.Cir.1979). Nor do an Inspector General's investigatory powers generally extend to matters that do not concern fraud, inefficiency, or waste within a federal agency. *See United States v. Montgomery County Crisis Center,* 676 F.Supp. 98, 99 (D.Md.1987) (refusing to enforce subpoena issued by Inspector General where the underlying investigation concerned a national security matter).

Today we recognize an additional, narrow limit on the Inspector General's broad investigatory and subpoena powers. In particular, we hold that an Inspector General lacks statutory authority to conduct, as part of a long-term, continuing plan, regulatory compliance investigations or audits. By "regulatory compliance investigations or audits," we mean those investigations or audits which are most appropriately viewed as being within the authority of the agency itself. Thus, as a general rule, when a regulatory statute makes a federal agency responsible for ensuring compliance with its provisions, the Inspector General of that agency will lack the authority to make investigations or conduct audits which are designed to carry out that function directly.

Our holding recognizing this limit to the authority of Inspectors General is supported by the language and purpose of the Inspector General Act of 1978. The purpose of the Act, as we have already stated, *see supra* Part I.A.2., was to create independent and objective units that would be responsible for combatting fraud, abuse, waste, and mismanagement in federal agencies and departments. If an Inspector General were to assume an agency's regulatory compliance function, his independence and objectiveness—qualities that Congress has expressly recognized are essential to the function of combatting fraud, abuse, waste, and mismanagement—would, in our view, be compromised. In addition, although Congress granted Inspectors General broad investigative and subpoena authority, Congress also expressed its intent that Inspectors General should not be allowed to conduct "program operating responsibilities" of an agency. *See* 5 U.S.C.App. 3 § 9(a)(2) (head of an agency may transfer to an Inspector General other functions, powers, and duties that he determines "are properly related to the functions of the [OIG] and would, if so transferred, further the purposes of this Act, *except that there shall not be transferred to an Inspector General ... program operating responsibilities*") (emphasis added).

Our holding is also supported by the legislative history of the Inspector General Act of 1978. It finds direct support in the House Report accompanying the Act, which states:

> While Inspectors General would have direct responsibility for conducting audits and investigations relating to the efficiency and economy of program operations and the prevention and detection of fraud and abuse in such programs, *they would not have such responsibility for audits and investigations constituting an integral part of the programs involved.*

H.R.REP. No. 584, 95th Cong., 1st Sess. 12-13 (1978) (emphasis added). And, our holding finds indirect support in certain statements made by Congressman Levitas, one of the co-sponsors of the 1978 Act. He explained:

> The Inspectors General to be appointed by the President with the advice and consent of the Senate will first of all be independent and *have no program responsibilities to divide allegiances.* The Inspectors General will be responsible for audits and investigations only.... Moreover, the offices of Inspector General would not be a new "layer of bureaucracy' to plague the public. *They would deal exclusively with the internal operations of the departments and agencies.* Their public contact would only be for the beneficial and needed purpose of receiving complaints about problems with agency administration and in the investigation of fraud and abuse by those persons who are misusing or stealing taxpayer dollars.

124 CONG.REC. 10,405 (1978) (emphasis added); *see also* S.REP. No. 1071, *supra,* at 27-28 (discussing duties and responsibilities of Inspectors General in terms suggesting that they would have only an "oversight" role).

Finally, our holding finds support in the March 9, 1989 memorandum prepared by the Department of Justice's Office of Legal Counsel. In this memorandum, the Office of Legal Counsel addressed the specific question of "whether the authority granted the Inspector General includes the authority to conduct investigations pursuant to statutes that provide the Department [of Labor] with regulatory jurisdiction over private individuals and entities that do not receive federal funds." Based on its review of the language, structure, purpose, and legislative history of the Inspector General Act of 1978, the Office of Legal Counsel concluded that the Act does not generally vest authority in the Inspector General to conduct regulatory investigations, which it defined as investigations that "have as their objective regulatory compliance by private parties." The Office of Legal Counsel stated: "Thus, the Inspector General has an oversight rather than a direct role in investigations conducted pursuant to regulatory statutes: he may investigate the Department's conduct of regulatory investigations but may not conduct such investigations himself." *But see also* 136 CONG.REC. E2551-01 (daily ed. July 30, 1990) (statement of Rep. Conte) (questioning the Office of Legal Counsel's interpretation of Inspector General's investigative authority); James R. Richards & William S. Fields, *The Inspector General Act: Are Its Investigative Provisions Adequate to Meet Current Needs,* 12 GEO. MASON U.L.REV. 227, 242-48 (while recognizing that Office of Legal Counsel's conclusion may be "legally defensible," nonetheless pointing out its potential for confusion and questioning the premises on which the conclusion is based).

Accordingly, we conclude that the Inspector General of the RRB is without statutory authority to conduct the proposed tax compliance audit of Burlington Northern. As we already outlined, *see supra* Part I.A.1., under the terms of the Railroad Unemployment Insurance Act, the RRB itself is charged with ensuring that railroad employers are accurately reporting taxable compensation and properly paying taxes. And, under the Railroad Retirement Tax Act, it is the IRS who has the responsibility for ensuring tax compliance. The Inspector General of the RRB, when it

attempted to assume the regulatory compliance functions of the RRB and the IRS, exceeded its statutory "oversight" authority. If the Inspector General were allowed to conduct regularly-scheduled, tax-compliance audits, there would be no one, so to speak, to "watch the watchdog." The district court, therefore, correctly denied enforcement of the subpoena.

## III. CONCLUSION

We emphasize the limited nature of our decision in this case: We are *not* holding that, under all circumstances, the Inspector General of the RRB lacks statutory authority to investigate or audit railroad employers' compensation reporting. The Inspector General of the RRB may well be able to do so as part of a plan to test the effectiveness of the RRB's summary reconciliation procedures or where he suspects fraud and abuse on the part of such employers. We hold only that, based on the district court's findings concerning the *nature* of this particular audit of Burlington Northern, the Inspector General exceeded his statutory authority. Moreover, we again note that the RRB clearly has the authority to conduct regularly scheduled, tax-compliance audits of railroad employers. Thus, while Burlington Northern has prevailed in this skirmish, the Inspector General, the RRB, and the IRS have a decided advantage in the war against tax non-compliance, waste, and fraud.

The district court's decision denying enforcement of the subpoena duces tecum is AFFIRMED.