# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 98-40364
_____

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

### CHEVRON U.S.A., INCORPORATED; CHEVRON CORPORATION,

Defendants-Appellants.

_____

### Appeal from the United States District Court
### for the Eastern District of Texas

_____

August 24, 1999

Before JONES, DUHÉ, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Concerning the alleged underpayment of royalties to the Government for production under federal oil and gas leases, chiefly at issue is the authority of the Inspector General (IG) for the Department of the Interior to subpoena documents from Chevron (pursuant to a district court enforcement order; Chevron has complied), Chevron having provided many of the same documents in other contexts not only to the Department of the Interior, but also to the Department of Justice. We **AFFIRM.**

I.

As an oil and gas lessee on federal and Indian lands, Chevron (Chevron USA, Inc., and Chevron Corporation) pays the United States royalties on its production. Chevron must report monthly production value to the Minerals Management Service of the Department of the Interior (MMS).

In 1996, the Interior *and* Justice Departments began investigations after private *qui tam* plaintiffs under the False Claims Act (FCA), 31 U.S.C. § 3730(b), alleged that Chevron, among others, had misrepresented the value of their federal lease production. The Department of the Interior IG issued administrative subpoenas to Chevron for documents related to the federal leases since 1986. The documents concerned both the value Chevron derived from the leases and the methods it used to calculate royalties.

Chevron objected to the subpoenas' scope and concomitant threat to confidential and proprietary information. In March 1997, the IG sought enforcement by the district court. Pursuant to an agreed order staying enforcement, the parties attempted to agree on a protective order. Negotiations having failed, the district court in January 1998 ordered the subpoenas enforced, but subject to an IG-drafted protective order. (As discussed *infra* in parts II.A. and C., Chevron challenges the protective order, especially its provisions concerning confidentiality/disclosure to third parties.)

The district court and this court denied stays pending appeal. Thereafter, Chevron complied with the subpoena.

Meanwhile, in the FCA case, and shortly before the January 1998 subpoena enforcement order, the Department of Justice issued Civil Investigative Demands (CIDs) for documents pertaining to Chevron's federal leases. The documents called for by the DOJ CIDs and the IG administrative subpoenas were similar, but not identical. For example, the CID called for documents dating back to 1990; the administrative subpoenas, to 1986.

## II.

## A.

Because Chevron has produced the documents in response to the IG subpoenas and DOJ CIDs, we face a threshold question of mootness, which we must address *sua sponte* if necessary. *E.g.*, *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998). "The mootness doctrine requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process." *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990).

Among other things, the continuing dispute regarding the protective order, discussed *infra*, keeps this a "live" controversy. The subpoenas and CIDs cover distinct sets of documents and offer different protections. Were we to vacate the enforcement order on any of the grounds Chevron advances, MMS would be required to return documents produced in response to the subpoenas, alleviating Chevron's concern. *See In re Grand Jury Subpoena*, 148 F.3d 487, 490 (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1336 (1999) (case not moot where court can still grant some relief by ordering documents

- 3 -

returned or destroyed) (citing ***Church of Scientology of California v. United States***, 506 U.S. 9, 13 (1992)).

B.

A subpoena enforcement order is reviewed for abuse of discretion. *E.g.*, ***N.L.R.B. v. G.H.R. Energy Corp.***, 707 F.2d 110, 113 (5th Cir. 1982). "[I]t is settled that the requirements for judicial enforcement of an administrative subpoena are minimal." ***Burlington Northern Railroad Co. v. Office of Inspector General, Railroad Retirement Board***, 983 F.2d 631, 637 (5th Cir. 1993). Courts will enforce an administrative subpoena if it (1) is within the agency's statutory authority; (2) seeks information reasonably relevant to the inquiry; (3) is not unreasonably broad or burdensome; and (4) is not issued for an improper purpose, such as harassment. *See, e.g.,* ***id.***, 983 F.2d at 638.

Pursuant to the first and third of these prongs, Chevron claims the subpoenas are outside the IG's authority and are unduly burdensome.

1.

Inspectors General were placed in various federal agencies and programs by the Inspector General Act of 1978 (IGA), 5 U.S.C. app. 3. *See* ***Burlington Northern***, 983 F.2d at 634. Amendments to the Act have added them to other agencies and programs. Interior was one of the original departments with an IG. 5 U.S.C. app. 3 § 11(2). Section 4(a) states his broad authority:

> It shall be the duty and responsibility of each Inspector General, with respect to the establishment within which his Office is established—

- 4 -

> (1) to provide policy direction for and to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of such establishment;
>
> ...
>
> (3) to recommend policies for, and to conduct, supervise, or coordinate other activities carried out or financed by such establishment for the purpose of promoting economy and efficiency in the administration of, *or preventing and detecting fraud and abuse in*, its programs and operations.

(Emphasis added.) Section 6(a)(4) of the IGA authorizes an IG

> to require by subpena [sic] the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by this Act....

a.

As discussed in ***Burlington Northern***, 983 F.2d at 634, concern about fraud in federal programs was one of Congress' primary reasons for enacting the IGA. In the light of Inspectors General being tasked by the IGA, as quoted above, with an anti-fraud mission, Chevron attempts to distinguish underpayment of royalties from "fraud and abuse" in MMS programs and operations. In this regard, it contends that only recipients of federal funds are subject to IG oversight.

Obviously, Chevron's receiving a federal *lease* (and the concomitant oil and gas production), rather than federal *funds*, makes its alleged fraud no less "fraud ... in" MMS' program. Needless to say, both an underpaying lessee *and* an overcharging

- 5 -

contractor extract a benefit fraudulently disproportionate to what is received by the Government; both fall squarely within the IG's statutory authority. The IGA legislative history Chevron cites referring to government-funded projects, *e.g.*, S. REP. NO. 95-1071, at 27, 34, *reprinted in* 1978 U.S.C.C.A.N. 2676, 2702, 2709 (referring to "the way in which Federal tax dollars are spent" and "the way federal funds are expended") sets out a central, but *not* exclusive, concern; it does *not* suggest a limit to such IG activities.

b.

*Burlington Northern* construed the IGA, 5 U.S.C. app. 3 § 9(a)(2) ("there shall not be transferred to an Inspector General ... program operating responsibilities") to bar IG investigations which, "as part of a long-term, continuing plan", perform "those investigations or audits which are most appropriately viewed as being within the authority of the agency itself". *Burlington Northern,* 983 F.3d at 642. There, based on the district court's finding that the IG investigation had such an improper purpose, our court affirmed the district court's refusal to enforce an IG subpoena. *Id.* at 640-41.

Chevron claims that, as did the tax audits in *Burlington Northern*, the subpoenas usurp MMS "program operating responsibilities". But, unlike the situation in *Burlington Northern*, the subpoenas do not assume MMS program operating responsibilities, because MMS continues to keep the relevant records. The subpoenas do not displace any agency

- 6 -

responsibilities; therefore, no agency functions have been "transferred" to the IG. As our court noted recently in distinguishing *Burlington Northern*,

> Section 9(a)(2) prohibits the transfer of 'program operating responsibilities,' and not the duplication of functions or copying of techniques. ... In order for a transfer of function to occur, the agency would have to relinquish its own performance of that function.

*Winters Ranch Partnership v. Viadero*, 123 F.3d 327, 334 (5th Cir. 1997). Performance of functions has not been relinquished by MMS; accordingly, the *Burlington Northern*/§9(a) limit is not implicated.

c.

Chevron maintains that IG subpoenas connected with an action under the FCA must be subject to the restrictions imposed upon DOJ CIDs. It invites us to infer an implicit limit on the IG flowing from the authority granted to DOJ by the FCA.

The 1986 FCA amendments, Pub. L. No. 99-562, 100 Stat. 3153 (1986), empower DOJ to issue CIDs for material or information relevant to a false claims law investigation. *See* 31 U.S.C. § 3733. CIDs differ from IG subpoenas in several ways. In some ways, they provide greater protection to the recipient than does a subpoena. For example, § 3733(a)(2)(G) makes the Attorney General's CID authority nondelegable; § 3733(i)(1) requires a single designated custodian for CID-obtained materials; § 3733(k) exempts CID materials from the Freedom of Information Act, 5 U.S.C. § 552; and § 3733(i)(2)(C) allows disclosure to other agencies or Congress only upon application to a district court and notice to

the CID recipient.   In other ways, CIDs are broader than a subpoena.   For example, § 3733(a)(1)(B) & (C) allow CIDs to seek types of information (such as oral testimony and answers to interrogatories) beyond that permitted an administrative subpoena.

Chevron's claim that the FCA limits the IG is belied by the silence in the FCA and IGA on the matter and by FCA legislative history, which plainly contemplates cooperation in FCA cases between an IG and DOJ.  *See, e.g.*, S. REP. No. 99-345, at 33 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5298 (noting that, in FCA cases, DOJ had historically relied on information from IGs and criminal grand juries, and that proposed CID authority would "*supplement*[] the investigative powers of the IGs" in the face of judicial limits on DOJ use of grand jury materials) (emphasis added).

Acknowledging this legislative history (but pointing to no other), Chevron claims that the FCA amendment confirms prior IG inability to investigate false claims; that, by "supplementing" IG investigative authority, the CIDs filled a void in IG authority. To say the least, this is a quite strained reading of "supplement", one belied by the explicit statement that, before the amendment, an IG's FCA material was available to DOJ.  Chevron's further claim that IG authority to investigate FCA claims would render superfluous and senseless the DOJ's CID authority ignores both the ways in which CIDs exceed IG subpoenas in scope and the usefulness to the DOJ of an independent investigative authority exercisable without IG participation.

- 8 -

The FCA empowers DOJ to investigate false claims against the Government, and the IGA empowers an IG to investigate fraud and abuse in government programs.  Obviously, investigative authority granted by each Act overlaps.  Obviously, if an IG investigation is within statutory authority, the fact that it also involves matters relevant to an FCA claim does not alter the propriety of the investigation.

2.

In the last of its challenges to two of the four bases that must be satisfied before a district court will enforce on administrative subpoena, Chevron claims that the subpoenas are overbroad *and* unduly burdensome. In the main, these contentions restate the complaints about the lack of CID-type protections. Chevron contends that the subpoenas are broader than a CID could be, for instance, because they cover years outside the FCA limitations period, or for which FCA claims are otherwise barred. (Chevron thus ironically asserts that the subpoena is invalid both because it covers documents *not* relevant to an FCA case, and also because it covers documents which *are*.)

However, "a subpoena is not unreasonably burdensome unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business". *F. T. C. v. Jim Walter Corp.*, 651 F.2d 251, 258 (5th Cir. 1981) (quotation omitted).  While the time and effort required to comply with the subpoena are obviously extensive (as is the alleged fraud), Chevron offers no explanation independent of its CID-related arguments why, relative to Chevron's

- 9 -

size, the compliance cost and effort "unduly disrupt[ed] or seriously hinder[ed] normal operations".

Chevron also contends that, because it has already provided many of the same documents to MMS for regulatory audits, the IG should not have been able to obtain them again. *See* **United States v. Powell**, 379 U.S. 48, 57-58 (1964) (agency seeking documents must not already have them in its possession). However, it is undisputed that MMS has not retained those documents. Chevron's producing them again may have been duplicative, but this is, in part, necessary for an independently-operating IG, consistent with the IGA and required by **Burlington Northern**.

## C.

Regarding the protective order, Chevron keys especially on the confidentiality/disclosure provisions. As part of the enforcement order, the district court found that the protective order "affords [Chevron] adequate protection". We review for abuse of discretion. *See* **Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit**, 28 F.3d 1388, 1394 (5th Cir. 1994) (protective order under FED. R. CIV. P. 26). (Of course, an abuse of discretion regarding the protective order would not alone compel vacating the enforcement order, the *only* relief Chevron seeks.)

The protective order, supplemented by the Government's post-argument stipulation in our court, proscribes disclosure of any confidential material, as designated pursuant to the protective order, to any other person except in accordance with the procedures set by the protective order; requires a court order for disclosure

to a private party, with the IG being required to resist, to the extent permitted by law, such parties' attempts to obtain documents (for instance, under the Freedom of Information Act), with notice to be given pre-disclosure to Chevron; permits disclosure to other agencies of the United States (subject to their maintaining the protections accorded confidential materal); and, concerning a request from Congress, permits disclosure, but Congress is to be advised about the protective order and Chevron is to be notified, unless Congress objects.

As with its claims of undue burden and overbreadth, Chevron's contentions largely restate its position regarding CIDs; it asserts that the confidentiality provisions are less than those provided by a CID, but points to no authority for this claimed entitlement to greater protections.  We find no abuse of discretion.

Along this line, we agree with the D.C. Circuit that an agency's determinations on the protections required for confidential information are not to be lightly disregarded.  *See* ***U.S. International Trade Com'n v. Tenneco West***, 822 F.2d 73, 79 (D.C. Cir. 1987) ("deference [is] due an agency in choosing its own procedures for guarding confidentiality"); ***F. T. C. v. Texaco, Inc.***, 555 F.2d 862, 884 n.62 (D.C. Cir. 1977) ("it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality") (citing ***FCC v. Schreiber***, 381 U.S. 279, 290-1, 295-6 (1965)).

Chevron's primary concern is, under the protective order as written, not being permitted to object to disclosure to third

- 11 -

parties (*not* including Congress or any agency of the United States).   But, the Government's post-argument *stipulation* has greatly deflated, *if not mooted*, this sub-issue.  Under protective order ¶1, "Protected Competitive Material" (designated pursuant to protective order-procedures) is *not* to "be disclosed to any other person except in accord with [the protective order] or as may otherwise be required by law".   As we directed at oral argument, the Government's post-argument submittal covers its "obligations to preserve the confidentiality of documents obtained through [the IG's] subpoenas".

Concerning the above quoted disclosure-proscription, the Government has *stipulated* that it "will *not* disclose Protected Competitive Material to any private party unless compelled to do so by a judicial order entered by a court of competent jurisdiction". (Emphasis added.)  In explaining why it has so stipulated, even though a disclosure-order is *not* explicitly required by the protective order, the Government states in its post-argument submittal that it "construe[s] these [protective order ¶1] provisions as barring voluntary governmental disclosure of Protected Confidential Material to Chevron's business competitors or to any other private party".   In that the Government has *stipulated* to no non-order disclosure, and in that, pursuant to protective order ¶10, Chevron must be given pre-disclosure notice, it may well be that the court considering disclosure *vel non* will allow Chevron to first object.  In any event, as noted, prior to such disclosure, the Government is to resist to the extent

permitted by law and "Chevron [is to] be given as much notice as practical", offering it opportunity to intervene and, *inter alia*, make a reverse Freedom of Information Act claim. *See* **Chrysler Corp. v. Brown**, 441 U.S. 281, 317-18 (1979) (allowing "reverse FOIA" challenge under Administrative Procedures Act to disclosure of documents).

Regarding disclosure to agencies of the United States, Chevron concedes that sharing of information between the IG and other agencies, such as DOJ, is contemplated in the legislative history of CID provisions cited above, the legislative history of the IGA, and other cases. *See, e.g.*, S. REP. No. 95-1071, at 6-7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2676, 2681-82 (recommending "inspector general concept" because it would "strengthen[] cooperation between the agency and [DOJ] in investigating and prosecuting fraud cases"); **U.S. v. Educational Development Network Corp.**, 884 F.2d 737, 743 n.10 (3rd Cir. 1989) ("Congress expected cooperation between the IG and [DOJ] in investigating and prosecuting fraud cases."); **U.S. v. Aero Mayflower Transit Co., Inc.**, 831 F.2d 1142, 1146 (D.C. Cir. 1987) ("So long as the Inspector General's subpoenas seek information relevant to the discharge of his duties, the exact degree of Justice Department guidance or influence seems manifestly immaterial."). And, for disclosure to such agencies and Congress, the former are to maintain the confidentiality provisions and the latter is to be notified about those provisions (with Chevron being notified, unless Congress objects).

Again, there was no abuse of discretion concerning the protective order. This is all the more so in the light of the Government's post-argument stipulation.

## III.

For the foregoing reasons, the enforcement order is

***AFFIRMED.***